**STATE of Missouri, ex rel. PUBLIC COUNSEL, Respondent,**

**Atmos Energy Corporation, Appellant,**

v.

**MISSOURI PUBLIC SERVICE COMMISSION, Respondent.**

**No. WD 70219.**

Missouri Court of Appeals, Western District.

June 23, 2009.

Larry W. Dority, for Appellant.

Jennifer L. Heintz, for Respondent Missouri Public Service Commission.

Marc D. Poston, for Respondent Office of Public Counsel.

Before Division One: JAMES E. WELSH, P.J., VICTOR C. HOWARD, Judge and ALOK AHUJA, Judge.

VICTOR C. HOWARD, Judge.

Atmos Energy Corporation ("Atmos") filed a request with the Missouri Public Service Commission ("the Commission") to increase its rates in order to recover approximately $3.4 million in additional annual revenue and also sought to implement a weather normalization adjustment ("WNA") mechanism. Atmos later abandoned both requests and adopted a proposal of the Commission's Staff that would allow Atmos to recover its non-gas costs through a straight fixed variable ("SFV") rate design. After holding evidentiary hearings, the Commission issued its order approving the SFV rate design. The Cole County Circuit Court reversed the Commission's order, finding it to be unlawful and unreasonable. The Commission's order is reversed and remanded in part and affirmed in part.

**Factual and Procedural Background**

Atmos is a public utility and gas corporation operating as a local distribution company that provides retail natural gas service to approximately 60,000 residential and business customers in Missouri. In April 2006, Atmos filed a request with the Commission to increase its rates and thereby increase its annual revenues by approximately $3.4 million. Atmos also initially sought to implement a WNA mechanism, which would mitigate the impact of weather variability on Atmos's revenue stream. Atmos later abandoned both its request for a revenue increase and its WNA proposal in favor of the SFV rate design recommended by the Commission's Staff. Atmos and Staff both agree that the SFV rate design should replace the traditional rate design that Atmos currently uses for its residential customers. The Missouri Office of the Public Counsel ("OPC") opposes the adoption of the SFV rate design and challenges the other various proposals that Atmos and Staff have agreed upon.

Although a customer's bill includes charges for gas costs and non-gas costs, only the non-gas charge is relevant to the SFV rate design issue. The non-gas charge recovers the costs that Atmos incurs in distributing gas to its customers. Under the traditional rate design that Atmos currently employs, non-gas charges include two components. Under the first component, Atmos charges a flat monthly rate to recover its fixed costs that are caused by all customers regardless of the amount of gas they use. Atmos's fixed costs of service include the costs to provide meters, service lines, and regulators. The second component is a volumetric charge, which is based on the amount of gas used

by the customer and allows Atmos to recover costs that vary with customer demand. The SFV rate design approved by the Commission will eliminate the volumetric charge and allow Atmos to recover all of its non-gas costs in a single fixed monthly charge.[1]

In addition to the implementation of the SFV rate design, the Commission's order included findings on several other issues. Among these issues was Staff's proposal to create a new general service class by splitting the current Small General Service ("SGS") class into an SGS class and a Medium General Service ("MGS") class. Staff proposed that the SGS class would include non-residential customers using 2,000 or fewer Ccf annually, and the MGS class would include non-residential customers using between 2,000 and 75,000 Ccf annually. Pursuant to the proposal, the SGS class would be charged using the SFV rate design, and the MGS class would remain under the traditional rate design utilizing both a fixed charge and a usage-based charge. Based on evidence indicating that customers using 2,000 or fewer Ccf per year are served by the same size and type of equipment as residential customers, the Commission approved the proposal.

The issues relating to Atmos's revenue requirement were presented to the Commission in three subparts: (1) the appropriate level of expense; (2) the appropriate rate of return and return on equity; and (3) the appropriate level of revenue excess or deficiency. Although Staff had initially concluded that Atmos was earning an excess of $1.2 million, instead of pursuing a revenue reduction, Staff chose to advocate a change in Atmos's rate design. Therefore, Staff recommended that Atmos's rev-

enues stay the same. In abandoning its original request for a rate increase and in adopting Staff's SFV rate design, Atmos agreed that revenues should remain the same. The Commission noted in its order that while OPC recommended that Atmos's rates be decreased based upon Staff's initial finding of excess earnings, OPC did not file any direct testimony regarding Atmos's revenue requirement and did not file a complaint against the reasonableness of Atmos's current rates. Thus, the Commission found that the appropriate level of revenue excess or deficiency was zero and that the issues of the appropriate level of expense, rate of return, and return on equity were rendered moot.

Staff next proposed to combine Atmos's seven Missouri districts into three new districts. Pursuant to the proposal, the Kirksville, Palmyra, and Hannibal/Canton/Bowling Green districts would be combined to form the Northeast district, the Neelyville and Southeast Missouri districts would be combined to form the Southeast district, and the Greeley and Butler districts would be combined to form the West Central district. Staff advocated consolidation for the purpose of simplifying administration and eliminating customer confusion regarding charges, and reasoned that the consolidation was appropriate because Atmos's cost of service did not differ substantially throughout Missouri. OPC opposed consolidation of the districts, arguing that Atmos had not performed a district specific cost study to substantiate its claim that costs do not differ among districts. The Commission found that it was just and reasonable to consolidate the districts because the evidence supported Atmos's claim that its cost to serve similarly situated customers in neighboring dis-

---

**1.** The proposed fixed monthly charges for each service area are as follows: $13.92 for Southeast Missouri and Neelyville; $19.43 for

Butler and Greeley; and $20.61 for Kirksville, Palmyra, and Hannibal/Canton/Bowling Green.

tricts was about the same and because it was unnecessary for Atmos to determine its costs to serve each of the original seven districts.

In their next proposal, Atmos and Staff advocated entering a negative amortization of $591,000 into Atmos's depreciation reserve account. Atmos's witness, Donald Roff, performed a depreciation study and concluded that Atmos's depreciation rates were generally too high. Mr. Roff recommended new depreciation rates and determined that, based on the difference between the current rates and his recommended rates, a negative amortization of $591,000 should be entered. Staff witness Guy Gilbert testified that Atmos had not kept accurate records, leaving him unable to perform a detailed depreciation analysis. Therefore, he recommended that the current depreciation rates remain in place. Mr. Gilbert testified that although the lack of data made it impossible for him to perform a depreciation analysis and verify the accuracy of the $591,000 figure, he did not disagree with Atmos's proposal to enter a negative amortization of that amount. Mr. Gilbert characterized the negative amortization of $591,000 as a surrogate to adjusting the depreciation rates until Atmos provided enough data to enable Staff to determine the appropriate depreciation rates. As to the effect of Atmos and Staff's proposal, Mr. Gilbert testified that it would result in an immediate benefit for customers by lowering their rates.

OPC objected to Atmos and Staff's proposal on two grounds. First, OPC argued that the accuracy of the $591,000 figure could not be verified by Staff because Atmos had provided insufficient data for Staff to perform a detailed depreciation analysis. Second, OPC claimed that while the negative amortization may provide an immediate benefit to current ratepayers, future ratepayers will have to pay back and pay a return on the $591,000. The Commission found that Atmos and Staff's proposal to enter a negative amortization of $591,000 should be implemented because it would offset an over-accrual to the depreciation reserve and would provide an immediate benefit to customers by lowering Atmos's depreciation expense. In addressing the second argument made by OPC, the Commission found that the benefits of negative amortization outweighed any potential harm that may result.

Staff's final proposal involved the charges applicable to customers who disconnect from Atmos's service for a period of time during the year. Testimony from a Staff witness showed that approximately ten percent of Atmos's customers disconnect for a month or more each year and that this was usually done during the warmer months when gas is unnecessary. These periods of disconnection caused Atmos to be unable to recover its fixed costs from the customers who disconnected their service. Staff therefore created a proposal with the intent to dissuade customers from disconnecting during the warmer months of the year. Under Staff's proposal, customers who disconnected and then chose to reconnect at the same address would pay a traditional reconnection charge of $24.00 and would also pay for all missed delivery charges that occurred while the customer was disconnected. Staff stated that its proposal to recover missed delivery charges would apply to any customer who disconnected and then reconnected at the same address during a twelve-month period, regardless of the reason for disconnecting. Although Atmos had its own proposal regarding seasonal reconnection charges, it also supported Staff's proposal. OPC challenged the proposal, arguing that it was unreasonable to charge customers for services they did not receive and that the charges would unfairly apply to cus-

tomers who disconnected for reasons other than avoiding charges during the warmer months.

The Commission found that the undisputed evidence showed that Atmos has a significant problem with lost revenues due to customers disconnecting for one month or more and then reconnecting at the same address. The Commission also found that Staff's proposal was a just and reasonable method of discouraging seasonal disconnection and ensuring that Atmos recovered its fixed costs of service. However, the Commission further found that because Staff's proposal was meant to specifically target those customers that disconnected during the warmer months, it was unreasonable to make the applicable time period for seasonal reconnection charges longer than seven months. Even with a seven-month limit on the time period for seasonal reconnection charges, the Commission noted that the additional fee for missed delivery charges may create a rate shock for some customers, especially low-income customers. Therefore, the Commission further reduced the applicable time period for seasonal reconnection charges to three and one-half months and otherwise approved Staff's proposal.

The Commission issued its order on February 22, 2007, approving Staff and Atmos's proposals to: (1) implement the SFV rate design; (2) create new SGS and MGS classes; (3) leave Atmos's revenue requirement unchanged; (4) consolidate Atmos's service areas into three districts; (5) enter a negative amortization of $591,000 into Atmos's depreciation reserve account; and (6) recover missed delivery charges from customers who disconnect and reconnect at the same address, with a three and one-half month limitation imposed by the Commission. Two of the Commissioners dissented, arguing that there were no reliable numbers upon which to determine Atmos's actual costs to serve its customers and that the seasonal reconnection charge proposal adopted by the Commission was inappropriate because customers should be able to leave and rejoin the system as they choose, subject only to the actual cost of reconnection to the system. OPC filed an application for rehearing, which the Commission denied. OPC then filed a petition for writ of review with the circuit court of Cole County, and the circuit court subsequently reversed and remanded the case, finding the Commission's order to be unlawful and unreasonable. This appeal followed.

## Standard of Review

In an appeal from an order of the Commission, we review the Commission's findings and decisions and not the circuit court's judgment. *State ex rel. Mo. Gas Energy v. Pub. Serv. Comm'n*, 186 S.W.3d 376, 381 (Mo.App. W.D.2005). Our review of the Commission's order has two prongs: "we determine first, whether the Commission's order is lawful, and second, whether the order is reasonable and based on competent and substantial evidence upon the whole record." *Id.* The issue of lawfulness "turns on whether the Commission had the statutory authority to act as it did." *Union Elec. Co. v. Pub. Serv. Comm'n*, 136 S.W.3d 146, 152 (Mo.App. W.D.2004). Whether the order is reasonable depends on "whether (i) the order is supported by substantial and competent evidence on the whole record, (ii) the decision is arbitrary, capricious or unreasonable, or (iii) the Commission abused its discretion." *Mo. Gas Energy*, 186 S.W.3d at 382.

In reviewing the Commission's order, we presume that the order is valid and the party attacking it has the burden of proving its invalidity. *Id.* at 381–82. We consider the evidence, along with all

reasonable supporting inferences, in the light most favorable to the Commission's order. *Id.* at 382. "[I]f substantial evidence supports either of two conflicting factual conclusions, '[we are] bound by the findings of the administrative tribunal.'" *State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n,* 120 S.W.3d 732, 735 (Mo. banc 2003) (quoting *Amway Corp. v. Dir. of Revenue,* 794 S.W.2d 666, 668 (Mo. banc 1990)). The determination of witness credibility , is left to the Commission, "'which is free to believe none, part, or all of the testimony.'" *Mo. Gas Energy,* 186 S.W.3d at 382 (quoting *Commerce Bank, N.A. v. Blasdel,* 141 S.W.3d 434, 456–57 n. 19 (Mo.App. W.D.2004)). "It is only where a Commission order is clearly contrary to the overwhelming weight of the evidence that we may set it aside." *Id.* Additionally, with regard to issues within the Commission's expertise, "we will not substitute our judgment for that of the Commission." *Union Elec. Co.,* 136 S.W.3d at 151.

## Analysis

### I. SFV Rate Design

In its first point on appeal, OPC contends that the Commission's adoption of the SFV rate design was unreasonable because the decision was not based on competent and substantial evidence, was arbitrary, and was an abuse of discretion. OPC also claims that the decision to adopt the design was unlawful because the SFV rate design discriminates against low-volume consumers and shifts risk from Atmos to its customers without considering the public interest.

 OPC first asserts that the Commission made an arbitrary finding in response to OPC's argument that the public interest could not be served without sufficient studies to show the true impact of the SFV rate design. The Commission addressed OPC's argument by stating:

There is no way of knowing 100 percent of the effects a fixed rate design will have on the ratepayers without having actually experienced such a design. However, the Commission finds the decision by Atmos to abandon its request for a $3.4 million revenue increase in its entirety is sufficient reason to overcome any doubts about the proposed rate design. Especially when considering that even a portion of that revenue increase, if found just and reasonable, could have a traumatic effect when spread out over the approximately 60,000 customers served by Atmos.

As OPC claims, the key phrase in the Commission's finding is "if found just and reasonable." Nowhere in its order does the Commission make a finding that any or all of the $3.4 million revenue increase Atmos initially requested was just and reasonable. The hypothetical effect of a revenue increase that Atmos may or may not have been entitled to has little, if any, connection to the reasonableness of the impact of the SFV rate design. Even if the Commission had found that Atmos was entitled to a $3.4 million revenue increase, such a finding does not serve as a substitute for a determination of the impact of the SFV rate design, which must stand on its own as a just and reasonable rate design. Thus, the Commission's finding in response to OPC's argument about the impact of the SFV rate design was arbitrary and does not justify the Commission's adoption of the design.

OPC next argues that the Commission improperly based its adoption of the SFV rate design on evidence regarding subsidization among residential customers because that evidence was not competent and substantial. OPC claimed before the Commission, and claims now, that the SFV rate design is contrary to public policy in that it will shift a substantial portion of Atmos's

cost to serve its customers to the customers with the lowest usage.[2] The Commission found that this shift in costs was warranted because the evidence showed that, under the traditional rate structure, customers using less than the average amount of gas were underpaying for the cost to serve them, while customers using more than the average amount of gas were overpaying for the cost to serve them. Based on the testimony of Staff witness Anne Ross, the Commission concluded that the cost of serving each residential customer is the same regardless of the customer's usage and that, therefore, under the traditional rate structure, high-use customers were subsidizing low-use customers.

While Atmos and the Commission cite to Ms. Ross's testimony regarding cost of service and subsidization in support of the Commission's decision to adopt the SFV rate design, OPC contends that Ms. Ross's testimony did not constitute competent and substantial evidence in that there was nothing in the record to substantiate her statements. In her pre-filed testimony, Ms. Ross made the following statements concerning cost of service and subsidization:

> An average customer who is using natural gas only for cooking will require the same meter as one who is heating their home with natural gas, because both are served with the Company's smallest meter. As long as a customer uses gas for any purpose, the company must invest in meters, regulators and service lines to serve that customer.
>
> . . . .

In response to a Staff data request, the Company indicated that the cost of meters, regulators and service lines, is the same for all districts.

> . . . .

> [The traditional rate design] unfairly penalizes customers using more than the average normalized usage level upon which rates were set in a previous rate proceeding. A household using more than the average level pays more than the cost required to serve it, while a household using less pays less than the cost. Put simply, the larger Residential users are subsidizing the smaller users.
>
> . . . .

> [T]he same plant investment must be made for both users,[3] and there will be no difference in billing, meter-reading, and other expenses.
>
> . . . .

> The [traditional] rate design forces the households that depend on natural gas for their essential space and water-heating needs to subsidize those that use natural gas for non-essential purposes.

In her testimony at a hearing before the Commission, Ms. Ross reiterated her position that Atmos's cost of service is the same for all residential customers and provided the following example:

> So, for instance, if somebody gets on . . . the system today and all they're going to do is cook with a gas stove—and we're just talking residentials, [Atmos will] put the exact same equipment outside the house . . . on that customer as they would on a customer that came on and said, I'm going to space heat, run a water heater and cook.

---

2. A study done by Staff witness Anne Ross shows that the highest volume residential users will likely see a decrease in their fixed charges and that the lowest volume residential users will experience an increase in their fixed charges.

3. "Both users" refers to a customer using natural gas only for a fireplace, versus a customer using natural gas for space and water heating.

■ In response to OPC's claim that Ms. Ross's testimony regarding subsidization and cost of service is not substantiated by the record, Atmos contends that Ms. Ross's testimony constitutes competent and substantial evidence. When this court inquired at oral argument as to the basis of Ms. Ross's subsidization testimony, counsel for Atmos replied that her testimony was based on the class cost of service (CCOS) studies performed by Staff witness Thomas Imhoff. However, as Atmos indicates in its brief, Ms. Ross merely relied on Mr. Imhoff's study to determine the fixed delivery charge for each district. Ms. Ross also explained in her pre-filed testimony that she used the class revenue requirements determined in Mr. Imhoff's studies in order to calculate the fixed charge for each district under the SFV rate design.[4] Therefore, Ms. Ross's testimony demonstrates that while Mr. Imhoff's studies assisted Ms. Ross in the calculation of the fixed charges, she did not rely on his studies in determining that Atmos's cost of service is the same for all residential customers and that higher volume users are subsidizing lower volume users.

Moreover, the CCOS studies themselves do not support a finding that the cost of service is the same for all residential customers or that there is subsidization within the residential class. Mr. Imhoff testified as to the purpose and results of Staff's CCOS studies. The customer classes used in the studies were Residential, Small General Service, Large General Service, and Large Volume Service. Mr. Imhoff testified that the purpose of a CCOS study "is to provide the Commission with a measure of relative class cost responsibility for the overall revenue requirements of Atmos."

The results of the study are then compared with the revenues currently being collected from each class. Any difference between a class's cost responsibility and the revenues collected from that class will show whether a class is subsidizing other classes or if that class is being subsidized. Therefore, as described by Mr. Imhoff, Staff's CCOS studies reveal subsidization among only the four classes used in the studies rather than subsidization among customers within a single class. Furthermore, Staff's studies allocate cost responsibility among the four classes and do not break down the costs within a single class. Thus, in addition to Ms. Ross's testimony that she only relied on the CCOS studies to determine the fixed charges for each district, Mr. Imhoff's testimony shows that the CCOS studies do not independently support a finding of subsidization within the residential class or a finding that Atmos's cost of service is the same for each residential customer. No intra-class study was conducted to determine the cost to serve high volume versus low volume residential users or to establish that one group of residential users was subsidizing another. In the absence of such a study, neither Mr. Imhoff's nor Ms. Ross's testimony constitutes competent and substantial evidence upon which the Commission could conclude that high volume customers are currently subsidizing low volume customers.

The Commission relied on Ms. Ross's testimony when it found that the cost of serving all residential customers is the same regardless of usage. Therefore, the question remains whether Ms. Ross's statements regarding cost of service constitute competent and substantial evidence. First, we note that when Ms. Ross testi-

---

4. Ms. Ross further testified that Staff calculated the fixed charge for each district by taking the residential class revenue requirement from Mr. Imhoff's study and dividing it by the number of annual residential bills.

fied that Atmos's cost of service is the same for each residential customer, she continually referred only to the costs associated with meters, regulators, and service lines, stating that, regardless of their usage, all residential customers have "the exact same equipment outside the house." The evidence shows that each of the costs mentioned by Ms. Ross was already included in the fixed charge recovered under the traditional rate design. As OPC argues, Ms. Ross's identification of these costs as fixed costs does not explain why costs previously recovered through a volumetric rate should now be shifted to a fixed charge. While Ms. Ross once mentioned that there are no differences in "other expenses," she failed to clarify to which expenses she was referring.

Additionally, Ms. Ross's statement that all residential customers have the same equipment outside of their homes does not address equipment and costs that go far beyond what is present on a residential customer's premises. While Ms. Ross solidified the concept that the costs of meters, regulators, and service lines are fixed regardless of a residential customer's usage, she did not provide an explanation as to why the costs previously recovered through a volumetric rate should be charged through a fixed rate rather than a usage-based rate. In its application for rehearing before the Commission and in its brief, OPC provides several examples of costs which are recovered or measured volumetrically under the traditional rate structure. These include storage costs, distribution measuring costs, and distribution regulating costs. Where Ms. Ross testified that certain costs are the same for each customer regardless of usage but failed to take all costs into account, her testimony does not constitute competent and substantial evidence upon which the Commission could find that the cost to serve all residential customers is the same.

■■■ OPC argues that in the absence of a cost of service study or consideration of the costs that are recovered through a usage-based rate under the traditional rate design, there is no competent and substantial evidence from which to conclude that high volume users are subsidizing low volume users because the cost to serve all residential customers is the same. Atmos acknowledges that OPC believes that the Commission should include other costs in its analysis but maintains that the Commission is not obligated to adopt OPC's approach to quantifying the cost of providing service to residential customers. However, when an agency's order "indicates that the agency completely failed 'to consider an important aspect or factor of the issue before it,' this court may find that the agency acted arbitrarily and capriciously." *State ex rel. GS Techs. Operating Co. v. Pub. Serv. Comm'n*, 116 S.W.3d 680, 692 (Mo.App. W.D.2003) (quoting *Barry Serv. Agency Co. v. Manning*, 891 S.W.2d 882, 892 (Mo.App. W.D.1995)). In considering OPC's argument that the SFV rate design would unjustly shift a substantial portion of the cost of service to the lowest use customers, the Commission made the following finding:

[T]he evidence shows that currently the low-use customer is being subsidized. For example, Ms. Ross testified that a customer who uses gas only for cooking will have the same equipment (meters and pipes) as a customer using natural gas for space heating, heating water, and cooking. The Commission finds that the cost of serving a residential customer is the same regardless of the customer's usage.

■■■ Not only does this portion of the order show that the Commission cites in support of its finding only Ms. Ross's testimony, which we have found does not con-

stitute competent and substantial evidence upon which to base such a finding, but it also demonstrates that the Commission failed to consider a multitude of costs that go beyond the meters and pipes installed on a residential customer's premises. Where an agency's findings are not based on competent and substantial evidence, the agency has acted unreasonably and arbitrarily. *Barry Serv. Agency Co.*, 891 S.W.2d at 892. As the Commission's findings regarding subsidization and the cost to serve residential customers were not based upon competent and substantial evidence, the Commission's adoption of the SFV rate design cannot be upheld based upon those findings.

In addition to its findings regarding subsidization and cost of service, the Commission found that the implementation of the SFV rate design was appropriate in that such a design would eliminate the effects of weather on Atmos's revenues and its customers' bills and would remove the disincentives for Atmos to encourage conservation by decoupling its revenues from its sales. While the SFV rate design may produce these effects, it will also have, in some cases, a significant effect on the non-gas portion of a residential customer's bill. For example, an exhibit Staff submitted shows that the new rate design will cause an annual increase of $148.32 for a customer in Kirksville using only 200 Ccf per year. The same exhibit shows that the new rate design will cause an annual decrease of $172.76 for a customer in Neelyville using 1,000 Ccf per year.

■ As Staff's exhibit indicates, by implementing a rate design where previously usage-based charges become entirely fixed and all customers within a district are charged the same non-gas rate regardless

of usage, all low volume users will see at least some increase in their bills, and many high volume users will see a decrease. However, Atmos and Staff have failed to provide competent and substantial evidence to support the bases upon which they justify the SFV rate design's impact on customer bills. There are no cost studies to substantiate Staff's testimony that the cost of service is the same or that there is subsidization between low and high volume residential users, which was a primary rationale cited by the Commission to justify adoption of the SFV structure. Without competent and substantial evidence to prove Staff's claims as to cost of service and subsidization, Staff has not shown that it is just and reasonable to shift all costs into a fixed charge that applies to all users within a district regardless of the amount of gas they consume. " 'However difficult may be the ascertainment of relevant and material factors in the establishment of just and reasonable rates, neither impulse nor expediency can be substituted for the requirement that rates be authorized by law and supported by competent and substantial evidence upon the whole record.' " *State ex rel. Sprint Spectrum L.P. v. Mo. Pub. Serv. Comm'n*, 112 S.W.3d 20, 28 (Mo.App. W.D.2003) (quoting *State ex rel. Mo. Water Co. v. Pub. Serv. Comm'n*, 308 S.W.2d 704, 720 (Mo.1957)). We reverse the Commission's decision to adopt the SFV rate design and remand for further proceedings.[5]

## II. SGS and MGS Classes

OPC next challenges the Commission's adoption of Staff's proposal to divide Atmos's current SGS class into an SGS class and an MGS class. OPC's argument turns

---

**5.** Our holding should not be interpreted to discourage the Commission's adoption of alternative rate designs, including an SFV rate design, when supported by competent and substantial evidence.

on whether it is reasonable to divide the classes at the 2,000 Ccf mark and charge the SGS class using the SFV rate design and the MGS class using the traditional rate structure. We have already determined that the Commission's decision to adopt the SFV rate design for residential customers was not supported by competent and substantial evidence. The Commission's order makes no further findings that would justify the adoption of the SFV rate design for the SGS class.[6] Because we have reversed the Commission's decision to adopt the SFV rate design and OPC's claim stems from the utilization of the SFV rate when billing the SGS class, review on this point is not yet warranted.

### III. Revenue Requirement

In its third point, OPC contends that the Commission's order does not contain sufficient findings of fact and conclusions of law regarding Atmos's revenue requirement and that the order is unlawful and unreasonable in that the Commission failed to reduce Atmos's return on equity (ROE) to reflect a reduction in shareholder risk. Atmos and the Commission argue that the order contains sufficient findings of fact and conclusions of law and that the Commission's decision to reject OPC's proposal to reduce Atmos's ROE was within the Commission's discretion and was based upon competent and substantial evidence.

In addressing the issue of the appropriate revenue requirement for Atmos, the Commission described the factual background as follows: Initially, Atmos filed a request to increase its revenue by approximately $3.4 million, and Staff determined that there was a $1.2 million revenue ex-

cess. However, Staff did not seek a revenue reduction or file an excess earnings complaint. Staff explained that it chose not to pursue the issue of excess revenue because it believed that it may not prevail on the issue, and that if it did not, Atmos might end up with no change in its revenue requirement or even a revenue increase. Thus, instead of advocating a change in Atmos's revenue requirement, Staff proposed that the Commission adopt the SFV rate design. Atmos subsequently abandoned its request for a revenue increase and also asked the Commission to approve the SFV rate design. Thus, both Staff and Atmos proposed that Atmos's annual revenues remain the same.

OPC recommended that the Commission reduce Atmos's revenue based on Staff's initial position regarding Atmos's revenue requirement. However, as the Commission noted, OPC did not file any direct testimony regarding Atmos's revenue requirement and did not file a complaint against the reasonableness of Atmos's current rates. Therefore, the Commission found that, based on the evidence and the positions of the parties, regardless of the rate design employed, the appropriate level of revenue excess or deficiency was zero and that no change in Atmos's revenue requirement was necessary.

OPC argues that the Commission failed to identify which evidence it found to be persuasive or unpersuasive, merely recited the parties' positions on the revenue requirement issue, and made an unexplained finding. OPC further claims that the Commission's "lack of findings [is] even more troubling when one considers that the Commission's Staff's testimony indicat-

---

6. The Commission's only findings regarding the application of the SFV rate design to the SGS class were that: (1) SGS customers "are served with the same meter/regulator and service lines as residential customers," and (2)

"a residential delivery charge for [SGS] customers using less than 2,000 Ccf per year within the same territory is just and reasonable."

ed Atmos is over-earning by approximately $1.2 million annually." As the Commission stated in its order, Staff had concluded that there was a $1.2 million excess but chose not to pursue that issue before the Commission. Similarly, Atmos did not pursue its request for a $3.4 million revenue increase. The Commission relied, in part, on Atmos's abandonment of its request for a $3.4 million rate increase as a basis to find Atmos's existing revenues to be just and reasonable. But Atmos's abandonment of the rate increase request seems to have been dependent on the Commission's acceptance of the SFV rate design. If, on remand, the parties decide to abandon their advocacy of the SFV rate structure, Atmos could well revert to seeking the rate increase.

There is a clear linkage between the adoption of a particular rate design and the considerations regarding Atmos's revenue requirement. Because we have reversed the Commission's decision to adopt the SFV rate design, the Commission's findings and conclusions regarding Atmos's overall revenue requirements are not ripe for review.

OPC's next contention concerns the Commission's findings on Atmos's ROE. OPC argues that because the Commission adopted a rate design that eliminated weather variability and reduced risk for Atmos's shareholders, the Commission should have applied a corresponding reduction to the ROE. Because OPC's argument is tied to the Commission's adoption of the SFV rate design, and we have reversed that decision, we will not review this facet of OPC's argument.

## IV. District Consolidation

In its fourth point, OPC contends that the Commission's decision to consolidate Atmos's service areas into three new districts was not based on competent and substantial evidence in that there was no cost data upon which to base the consolidation. OPC argues that consolidation should not occur until comprehensive cost studies are conducted.

The Commission found that based on Staff's evidence, Atmos's districts should be consolidated. The Commission cited to Staff's evidence showing that customers in neighboring districts were currently paying different costs for the same gas usage. Because the Commission found that the cost for Atmos to serve similarly situated customers in neighboring districts was "about the same," the Commission found consolidation to be appropriate. It further found that it was unnecessary for Atmos to determine its costs to serve each of the seven original districts, "particularly in light of the reasonableness of combining these districts." In her pre-filed rebuttal testimony, Ms. Ross stated that while having comprehensive cost data "would be informative, I believe that it is reasonable to conclude that the cost to serve similarly situated customers in contiguous districts is approximately the same."

During a hearing before the Commission, Ms. Ross also testified that Staff conducted three CCOS studies—one for each of the proposed districts—but did not conduct a separate study for each of the seven original districts. Ms. Ross stated that it may not be possible to conduct a comprehensive cost study for each district for two reasons. First, she stated that there were some problems with the depreciation data provided by Atmos and that she did not think Staff would "ever have exact information upon which to base customer charges." Second, Ms. Ross reasoned that because there are many shared services, it would be "difficult to develop cost studies for each individual district." However, Ms. Ross then admitted that such shared costs could be allocated in

some manner. Finally, Ms. Ross acknowledged that Staff's accounting schedule data determines the cost for each of the seven districts and that Staff combined that data into three districts and used it in their cost studies.

 The Commission based its decision to consolidate Atmos's districts on the alleged "fact" that the cost to serve Atmos's residential customers throughout the state is the same. However, Staff failed to conduct cost studies on each of the original districts to determine whether the cost to serve each area was indeed the same. Without such evidence, Ms. Ross's claim that the cost of service is roughly the same among each district is purely speculative. Therefore, we find that the Commission's decision to consolidate Atmos's districts was not based on competent and substantial evidence. Additionally, although Ms. Ross testified that Staff may never have exact information upon which to base charges and that it would be difficult to determine the cost to serve each of the original districts, she also agreed that Staff used data that determined the cost for the original districts but combined it into the three proposed districts for Staff's cost studies. Even if one hundred percent of the necessary information is not available, and it may be difficult to conduct a cost study for each original district, Staff's own testimony indicates that they have at least some of the information necessary to conduct studies to establish the cost to serve the original districts. Thus, we agree with OPC that it was unreasonable for the Commission to approve consolidation of the districts without the benefit of studies determining the costs for each district, and we reverse the Commission's decision on this issue.

## V. Negative Amortization

In its next point, OPC contends that the Commission's adoption of Staff's proposal to enter a negative amortization of $591,000 into Atmos's depreciation reserve account was unlawful because future ratepayers will be required to repay the $591,000. OPC also claims that the Commission's adoption of the proposal was unreasonable because it was not based on competent and substantial evidence, was arbitrary, and constituted an abuse of discretion.

Regarding the effect of Staff's proposal, OPC argues that it is unlawful and unreasonable in that, while it may provide a benefit to current ratepayers, future ratepayers will be required to repay the $591,000 and pay a return on that amount as well. Based on the testimony of Staff witness Guy Gilbert, the Commission found that Staff's proposal would provide an immediate benefit to customers by lowering Atmos's depreciation expense to the level that Staff and Atmos believe to be appropriate. Although Mr. Gilbert admitted that future ratepayers would be required to repay the $591,000 at some rate of depreciation, he also stated that ratepayers would pay less under Staff's proposal than they would pay with different depreciation rates. The Commission found that the benefits of Staff's proposal Mr. Gilbert cited to outweighed any potential harm that could result from the negative amortization.

 "[W]here a decision rests on the exercise of regulatory discretion, we will not substitute our judgment for that of the Commission," and neither will we re-weigh the evidence. *Mo. Gas Energy*, 186 S.W.3d at 382. The Commission took both the benefits and potential detriments to customers into account when coming to its decision and determined that a negative amortization would best serve Atmos's customers. Furthermore, the evidence and the Commission's order

explain that due to the lack of depreciation data, the correct depreciation rates could not currently be determined. Atmos agreed to update its records,[7] and Mr. Gilbert testified that once Atmos provided Staff with the updated records, Staff could conduct a depreciation study to determine the correct depreciation rates. Thus, the Commission agreed with Atmos and Staff that, as a practical matter, the proposed method of entering a negative amortization of $591,000 was an appropriate method by which to correct Atmos's over-accrual until such time that the proper depreciation rates could be determined. The Commission's decision to adopt the negative amortization method was reasonable and supported by competent and substantial evidence.

In the second portion of its argument, OPC claims that the amount of $591,000 was not based on competent and substantial evidence. OPC points to Mr. Gilbert's testimony, in which he stated that because Atmos provided insufficient depreciation data to Staff, he was unable to verify the accuracy of the $591,000 figure but accepted Atmos's recognition of an over-accrual of depreciation. However, Atmos had its own depreciation witness, Donald Roff, who performed a depreciation analysis and recommended the negative amortization of the amount of $591,000. OPC attacks not Mr. Roff's testimony or the study he conducted but, rather, attacks the testimony of Mr. Gilbert, who merely adopted the $591,000 figure determined by Mr. Roff. The Commission found that, based on Staff and Atmos's proposals, the annual depreciation accrual should be reduced by $591,000. The Commission was free to believe Mr. Roff's testimony regarding the $591,000 figure. *See Mo. Gas Energy*, 186 S.W.3d at 382. Moreover, the Commis-

sion's factual findings are presumed to be valid and OPC, as the party challenging the Commission's finding, "bears the burden of demonstrating that the decision was unlawful or unreasonable." *Envtl. Utils., LLC v. Pub. Serv. Comm'n*, 219 S.W.3d 256, 263 (Mo.App. W.D.2007). Where OPC has failed to challenge Mr. Roff's testimony or his depreciation study, wherein he calculated the $591,000 amount, OPC has not met its burden of demonstrating that the Commission's finding was not supported by competent and substantial evidence. Thus, we affirm the Commission's decision ordering the entry of a negative amortization of $591,000 in Atmos's depreciation reserve account.

## VI. Seasonal Reconnection Charges

In its final point, OPC challenges the Commission's decision allowing Atmos to bill customers for missed delivery charges when they disconnect their service for less than three and one-half months and subsequently reconnect at the same address. OPC contends that the decision is unlawful because it requires customers to pay for services they have not received and that the charge discriminates against temporarily disconnected customers.

The Commission found that, based on the testimony of Staff witness Michael Ensrud, approximately ten percent of Atmos's customers disconnect for a month or more each year. OPC does not dispute this evidence. The Commission also found that Atmos is unable to recover its fixed costs from these customers while they are disconnected. In evaluating the reasonableness of Staff's original proposal, the Commission limited the applicable time period for the charges to seven months in order to more effectively target those customers who disconnect during the summer

---

7. This agreement is contained in the Partial Non–Unanimous Stipulation and Agreement

that Atmos, Staff, and OPC submitted to the Commission in November 2006.

months. The Commission then considered the impact of the seasonal reconnection charges and further limited the applicable time period to three and one-half months in order to mitigate the potential rate shock induced by the new charge.

OPC also argues that the seasonal reconnection charge is discriminatory because, although it is intended to target customers who disconnect when the weather is warm, it also applies to customers who may have disconnected their service for other reasons. However, the fact that the charge applies regardless of the customer's reason for disconnecting demonstrates that the charge is not discriminatory. Because the charge applies equally to similarly situated customers, those whose services are disconnected for any reason and then reconnected at the same address within three and one-half months, the charge approved by the Commission is not discriminatory. As the reviewing court, we are not entitled to substitute our judgment for that of the Commission if the Commission's decision is supported by competent and substantial evidence. *State ex rel. Associated Natural Gas Co. v. Pub. Serv. Comm'n,* 954 S.W.2d 520, 528 (Mo. App. W.D.1997). However, because we have reversed and remanded the Commission's adoption of the SFV rate design, we remand this issue back to the Commission to allow it the flexibility of revising its findings and conclusions depending on the rate structure ultimately adopted. The Commission reduced the "foregone charge recovery period" to three and one-half months, based on its concerns for "rate shock" to reconnecting customers (Staff had advocated the recovery of up to twelve months of foregone charges). Obviously, concerns over "rate shock" vary depending on *how much* the reconnection charge will be. However, it remains to be determined how much the reconnection charge will be,

and how it will be structured, depending on the rate design that ultimately prevails.

### Conclusion

Due to the absence of competent and substantial evidence to support the Commission's findings regarding subsidization and Atmos's cost of service, we reverse the Commission's decisions adopting the SFV rate design and approving consolidation of Atmos's districts and remand those matters to the Commission for further proceedings. In light of our reversal of the Commission's adoption of the SFV rate design, we do not address OPC's arguments regarding Atmos's ROE, revenue requirement, the creation of new SGS and MGS classes, or the amount or structure of any seasonal reconnection proposals. Finally, we affirm the Commission's order adopting Staff's negative amortization proposal.

All concur.