**14**

In the MATTER OF the WATER RATE REQUEST OF HILLCREST UTILITY OPERATING COMPANY, INC., Respondent,

The Office of Public Counsel, Appellant,

v.

Missouri Public Service Commission, Respondent.

WD 79971

Missouri Court of Appeals, Western District.

Opinion filed: March 14, 2017

Motion for Rehearing and/or Transfer to Supreme Court Denied April 27, 2017

Application for Transfer Denied June 27, 2017

Lera L. Shemwell, Jefferson City, for Appellant.

Jennifer L. Heintz, for Respondent Missouri Public Service Commission.

Before Division One: James E. Welsh, Presiding Judge, Anthony Rex Gabbert, Judge and Edward R. Ardini, Jr., Judge

## EDWARD R. ARDINI, JR., JUDGE

The Office of Public Counsel ("the OPC") appeals the Report and Order of the Public Service Commission ("the Commission") authorizing new rates for Hillcrest Utility Operating Company, Inc. ("Hillcrest") which provides water and sewer services in Cape Girardeau County. The OPC argues that the Commission's Report and Order was unlawful, unreasonable, arbitrary, capricious, and not supported by the evidence. Finding no error, we affirm.

### Factual and Procedural Background

Hillcrest is a water and sewer utility company as defined by the laws of the state of Missouri. The company provides services to approximately 218 residential customers, 20 apartment customers, and 4 commercial customers. Hillcrest is a wholly owned subsidiary of Hillcrest Utility Holding Company, Inc., which is wholly

owned by First Round CSWR, LLC ("First Round"), which, in turn, is managed by Central States Water Resources, Inc. Hillcrest's president is Josiah Cox ("Cox").

The water and sewer systems that are the subject of this appeal were originally owned by Brandco Investments, LLC ("Brandco"). Hillcrest set out to acquire the systems from Brandco in 2014. At the time, the Brandco systems were in a state of severe disrepair. The wastewater system had been the subject of multiple compliance and enforcement actions from both the Missouri Department of Natural Resources ("MDNR") and the Missouri Attorney General, while the drinking water system had been put on an eight-week boil order due to positive test results for E. coli. Prior to acquiring Brandco, Hillcrest entered into an agreement with the MDNR under which it committed to making necessary repairs to the systems and taking emergency steps to ensure that residents would be able to receive water services which included Hillcrest paying for emergency drinking water repairs, on-going drinking water system inspections, and a temporary chlorine disinfection system. Hillcrest anticipated that the necessary improvements would cost upwards of $1,230,000.

On May 13, 2014, Hillcrest filed with the Commission a request for approval of the acquisition of the Brandco systems, as well as the right to issue indebtedness and to encumber the acquired water and sewer systems in order to fund the improvements necessary to bring the systems into regulatory compliance. After some initial disagreement, Hillcrest and the Staff of the Commission ("Staff") filed a non-unanimous[1] stipulation and agreement that

---

1. The Office of Public Counsel was a party to the case but did not sign the stipulation and agreement; however, as it did not object to

the agreement within seven days of filing, the Commission treated the agreement as unani-

would permit Hillcrest to acquire the Brandco systems subject to certain conditions. As part of the stipulation and agreement, Hillcrest was authorized to finance the acquisition through a loan agreement with Fresh Start Ventures, LLC ("Fresh Start").[2] The Commission issued an order in that case on October 22, 2014, that approved the stipulation and agreement and granted Hillcrest a certificate of convenience and necessity.[3] The transaction between Hillcrest and Brandco closed on March 13, 2015, and Hillcrest began making improvements approximately thirty days after acquisition. Hillcrest completed the improvements in the fall of 2015 after investing approximately $1,205,000 into the systems.

Prior to the acquisition by Hillcrest, the Brandco systems had not received a rate increase since 1989. On September 15, 2015, Hillcrest filed a letter with the Commission requesting an increase to its annual water and sewer operating revenues. Hillcrest met with Staff in an attempt to settle the issues surrounding the rate increase. A consensus was eventually reached between Staff and Hillcrest as to some of the issues, and the two jointly filed a Partial Agreement setting out the resolved issues while simultaneously setting aside the remaining issues for resolution at an evidentiary hearing before the Commission. A hearing was held before the Commission on May 19, 2016, during which the parties put forward evidence regarding the unresolved issues.

One of the issues which was addressed at the evidentiary hearing, and which forms the primary point of contention in the appeal now before us, was the cost of debt component of Hillcrest's capital structure.[4] Hillcrest presented evidence that Cox, in attempting to secure financing for Hillcrest's repair of the Brandco systems, had met with over 50 specialized infrastructure institutional investors, private equity investors, investment bankers, and commercial banks to no avail. Cox

mous under Commission Rule 4 CSR 240-2.115(2).

2. Fresh Start was formed in 2014 specifically for the purpose of providing financing to Hillcrest relating to the improvements of the Brandco systems. It was originally comprised of 12 equity investors, however it was later acquired in its entirety by two new investors who would also go on to acquire 87% of First Round.

3. The order became effective November 1, 2014.

4. Cost of debt represents "the costs [of] a corporation to borrow money and pay interest." *State ex rel. Missouri Gas Energy v. Public Service Com'n*, 186 S.W.3d 376, 383 (Mo. App. W.D. 2005). It is similar in nature to the cost of equity, which is the cost associated with "issuing stock and paying dividends or a return on investment." *Id.* Both are necessary components in determining a utility company's rate of return. *Id.* ("[R]ate of return is determined by a calculation that factors in (i) the ratio of debt and equity to total capital, and (ii) the cost and (iii) weighted cost for each of these capital components."). "The rate of return is, essentially, the amount that a utility must pay to secure financing from debt and equity investors." *State ex rel. Public Counsel v. Public Service Com'n*, 274 S.W.3d 569, 573 (Mo. App. W.D. 2009). Consequently, the rate of return is an essential factor to determining what rates to set. On the one hand, the rate of return must be high enough to cover "utility operating expenses, debt service, and dividends ... compensate[ ] investors for the risks of investment, and .....attract capital and assure confidence in the enterprise's financial integrity." *Mo. Gas Energy*, 186 S.W.3d at 383 (quoting *State ex rel. Assoc. Natural Gas Co. v. Public Service Com'n of Missouri*, 706 S.W.2d 870, 875 (Mo. App. W.D. 1985)). On the other hand, "[t]he rate of return should not be higher than [necessary] ... [o]therwise, utility customers will pay excessive prices, something regulation seeks to prohibit." *Id.* (quoting *Assoc. Natural Gas Co.*, 706 S.W.2d at 875).

testified that, in the end, the only financing that could be acquired was the financing agreement entered into on March 6, 2015, with Fresh Start at an interest rate of 14%. Hillcrest argued that the Commission should use the actual 14% rate from the financing agreement as its cost of debt for purposes of determining the proper rate of return.

Staff disagreed with Hillcrest's assessment of its cost of debt. They argued that the commission should impute a cost of debt between 8.88% and 10.13%.[5] Staff pointed to the fact that prior to March 6, 2015, two new investors had acquired 100% interest in Fresh Start as well as an 87% stake in First Round. They were concerned that the investment structure of Hillcrest and its associated entities was consequently too complex, not transparent, and consisted of nontraditional affiliations between investors. As a result, Staff suspected that the 14% interest rate had not originated from an arms-length, good-faith transaction. The Commission acknowledged Staff's concerns but found Cox's testimony regarding his efforts to acquire financing from other sources to be credible and declined to impute a lower cost of debt to Hillcrest. The Commission issued a Report and Order with findings of fact and conclusions of law establishing new rates for Hillcrest calculated, in part, using the 14% cost of debt contained in the financing agreement. The OPC filed an application for rehearing, which was denied. This appeal follows.

## Points Raised on Appeal

The OPC raises two points on appeal. First, they argue that the Commission erred in setting rates for Hillcrest's customers because it unlawfully applied the presumption of prudence to Hillcrest's cost of debt, which they characterize as an affiliate transaction. Second, they argue that the Commission's Report and Order is unlawful, unreasonable, arbitrary, capricious, and not supported by the evidence claiming that the Commission ignored Staff's evidence regarding the proposed imputed cost of debt.

## Standard of Review

"The PSC's order has a presumption of validity, and the burden of proof is on the appellant to prove that the order is unlawful or unreasonable." *Office of Public Counsel v. Missouri Public Service Com'n*, 409 S.W.3d 371, 375 (Mo. banc 2013) [hereinafter *Atmos*]. An appellate court's review of a PSC order is two pronged. "[F]irst, the reviewing court must determine whether the [Commission]'s order is lawful; and second, the court must determine whether the order is reasonable." *Id.* (quoting *State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n of State*, 120 S.W.3d 732, 734 (Mo. banc 2003)). "An order is lawful if the Commission acted within its statutory authority." *City of O'Fallon v. Union Electric Co.*, 462 S.W.3d 438, 442 (Mo. App. W.D. 2015). In making this determination, all questions of law are reviewed *de novo*. *Atmos*, 409 S.W.3d at 375. "An order is reasonable if it is supported by substantial, competent evidence, it is not arbitrary or capricious, and the Commission has not abused its discretion." *Union Electric Co.*, 462 S.W.3d at 442. "We consider the evidence, along with all reasonable supporting inferences, in the light most favorable to the Commission's order." *State ex rel. Public Counsel v. Missouri Public Service Com'n*, 289 S.W.3d 240, 247 (Mo. App. W.D. 2009). If

---

5. Staff determined this proposed range by estimating a cost of debt based on junk bond debt yields from published indices that they believed would satisfy a hypothetical third-party debt investor's market requirements.

the evidence supports two conflicting conclusions, we will defer to the Commission's factual findings. *Id.*

### Discussion

 In their first point, the OPC contends that the Commission unlawfully applied the presumption of prudence with regard to Hillcrest's cost of debt. The presumption of prudence is "not a creature of statute or regulation" but rather was first "recognized by the [Commission] in *Matter of Union Electric*, 27 Mo. P.S.C. (N.S.) 183 (1985) and ... applied by it since that point." *Atmos*, 409 S.W.3d at 376. Its purpose is to help in "determining whether a utility properly incurred its expenditures." *Id.* The presumption of prudence "sets out an *evidentiary presumption*" which "provides that the utility's expenditures are presumed to be prudent until adequate contrary evidence is produced, at which point the presumption disappears from the case." *Id.* at 379 (emphasis in original). The "presumption affects who has the burden of proceeding, but it does not change the burden of proof, which by statute must remain on the utility." *Id.* (citing Mo. Rev. Stat, § 393.150.2).

 The basis for the presumption lies in the fact that it is assumed that a company will naturally seek the lowest cost possible when incurring expenses. As noted by the Missouri Supreme Court in *Atmos*,

when considering expenditures for utility companies "dealing at arms-length, there is a diminished probability of collusion and the pressures of a competitive market create an assumption of legitimacy." *Id.* at 376. However, the court in *Atmos* also found that the same could not be said for transactions between affiliated companies "because of the greater risk of self-dealing when contracting with an affiliate." *Id.* at 377. Consequently, the Missouri Supreme Court found that "the presumption of prudence is inapplicable to affiliate transactions." *Id.* In the present case, the OPC argues that the Commission inappropriately applied the presumption of prudence to the 14% cost of debt associated with the financing agreement between Hillcrest and Fresh Start in violation of the *Atmos* decision.[6] The OPC is incorrect, however, as the record before us supports the conclusion that the Commission did not employ the presumption of prudence in this matter.

The record indicates that the Commission did not *presume* the 14% cost of debt to be appropriate but rather *determined* it was appropriate based on the evidence presented at the evidentiary hearing. Specifically, the Commission relied on the testimony of Cox that demonstrated that he had fastidiously tried to find lower cost financing but was unsuccessful in that effort. The commission explicitly stated:

> Round and 100% of Fresh Start were owned by the same investors, yet the details of the financing agreement appear to have been established prior to the entry of these investors and the financing agreement does not appear to have changed as a result of the change in investors. It is unclear what effect these factors would have, if any, on the application of the *Atmos* decision to the present case. We need not address either of these issues, however, as we find no evidence that the Commission employed the presumption of prudence in reaching its decision.

6. The Court in *Atmos* was considering a transaction between a gas utility and one of its affiliates. *Atmos*, 409 S.W.3d at 373. Such affiliate transactions for gas companies are governed by 4 CSR 240–40.016. There is no comparable Commission rule regulating water or sewer companies. As an initial matter therefore, there is a question to what extent the *Atmos* decision is applicable to the current situation. There is also a question as to whether the Fresh Start financing agreement should be considered an affiliate transaction for the purposes of *Atmos*. At the time the financing agreement was signed, 87% of First

The evidence shows that after diligent efforts to obtain financing from variety of potential lenders, the only financing available to Hillcrest at that time was the transaction with Fresh Start. Penalizing Hillcrest now for that decision would be unfair and may discourage other companies from acquiring and improving troubled water and sewer utilities in the future, which would be contrary to good public policy. The Commission concludes that the appropriate allowed debt rate to apply to the debt in the ratemaking capital structure is the actual debt cost of 14%.

Nowhere in its Report and Order does the Commission allude to granting Hillcrest any form of presumption on this issue. On the contrary, the Commission, based on the testimony of Cox, found "Hillcrest has met its burden of proof to demonstrate that it sought the least-cost financing option available to it." What is established by evidence is not presumed. The Commission's decision was not the product of any presumption; rather, it was a conclusion drawn from the evidence presented.

The OPC attempts to avoid this conclusion by drawing our attention to two statements from the Commission's Report and Order that they claim demonstrate that the Commission applied the presumption of prudence. First, they point to a statement in the finding of facts that reads:

> Staff recommends a hypothetical cost of debt much lower than Hillcrest's actual debt cost with Fresh Start because Staff does not know how the 14% debt cost was determined and suspects that the debt cost did not result from arms-length good faith negotiations. Staff is

concerned about accepting 14% as a market-based cost of debt because it views the investment structure of Hillcrest and associated entities as complex, not transparent, and consisting of non-traditional affiliations between investors. However, Staff has not alleged that Hillcrest's debt is imprudent.

This finding does not, as the OPC argues, suggest the Commission attempted to shift the burden onto Staff.[7] Indeed, elsewhere in the Report and Order, the Commission specifically stated that "[a]s the party requesting the rate increase, Hillcrest bears the burden of proving that its proposed rate increase is just and reasonable." Further, the Commission's Report and Order is bereft of any suggestion of reliance on Staff's failure to allege that Hillcrest's cost of debt is imprudent. Instead the commission relied, as previously discussed, on the testimony of Cox to show that the 14% cost of debt was prudent, as it was the only financing he could secure after diligent inquiries.

The second statement from the Report and Order that the OPC relies on is the Commission's acknowledgment that Staff "expressed suspicions that the financing agreement with Fresh Start was not an arms-length transaction but did not present sufficient evidence to support that allegation." Once again, the OPC attempts to characterize this statement as an intimation by the Commission that it shifted the burden onto Staff, but this is not the case. Hillcrest put forward evidence in support of the fact that the Fresh Start financing agreement was the result of a meticulous process to find the lowest cost financing.

---

7. This statement appears to be a reference to an exchange at the evidentiary hearing where Hillcrest's counsel asked Staff's witness "But—and this is close to a question that Ms. Mayfield asked—you haven't alleged that Hillcrest debt is imprudent, have you?" to which Staff's witness replied "The 14-percent rate is not consistent with the rate that would be attained from a third-party pass of (sic) debt investor, but I have not stated that it's imprudent."

Staff suggested that the terms of the deal may not have been the result of an arm-length transaction, but offered no evidence to show that more favorable financing terms were genuinely available to Hill-crest. The Commission made its decision based on the evidence actually presented to it and the statement simply acknowledged Staff's failure to rebut the *evidence* presented by Hillcrest, not a presumption applied by the Commission.

Neither of the two instances cited to by the OPC support the conclusion that any presumption, "of prudence" or otherwise, was applied by the Commission. On the contrary, the Commission's Report and Order establishes that its findings on the cost of debt were based on the evidence presented by the parties at the hearing. Because the Commission did not employ the presumption of prudence in reaching its decision, the OPC's argument that the Commission's Report and Order is unlawful must fail. The OPC's first point is denied.

In their second point, the OPC argues that the Commission's Report and Order was not supported by the evidence. Their argument mirrors that raised by Staff at the evidentiary hearing, namely that the financing agreement between Hillcrest and Fresh Start was not the product of an arms-length negotiation and that the Commission should have imputed Staff's proposed cost of debt. As has already been explained, the Commission heard testimony from Cox that he had worked diligently to find cheaper, more traditional financing and had been unsuccessful. Staff, concerned about the lack of perceived transparency, presented evidence in support of a proposed cost of debt range based on estimates using junk bond type debt yields from published indices that Staff argued would be acceptable to hypothetical investors. In response, Cox provided testimony to rebut Staff's proposed cost of debt range, arguing that Staff had implied a hypothetical market rating for a debt instrument size that did not exist, on a credit rating that did not apply, for an asset that was not able to be rated. The Commission considered the testimony of Cox to be credible, and we defer to the commission on matters of credibility. *State ex rel. Public Counsel v. Missouri Public Service Com'n*, 289 S.W.3d 240, 247 (Mo. App. W.D. 2009). Further, Staff's evidence, at best, could only establish an equally plausible conflicting conclusion, in which case we again defer to the finding of the Commission. *Id.* The Commission considered all of the evidence presented and made a decision based on that evidence. We can find no basis to determine that the Commission abused its discretion or otherwise acted unreasonably, arbitrarily, or capriciously. The OPC's second point is denied.

### Conclusion

The Commission's Report and Order is affirmed.

All concur.