**OFFICE OF the PUBLIC COUNSEL,
Appellant,**

v.

**MISSOURI PUBLIC SERVICE COM-
MISSION and Atmos Energy Cor-
poration, Respondents.**

No. SC 92964.

Supreme Court of Missouri,
En Banc.

July 30, 2013.

Rehearing Denied Sept. 10, 2013.

Opinion Modified on Court's Own
Motion Sept. 10, 2013.

Marc Poston, Deputy Counsel, Jefferson City, for The Office of Public Counsel.

Jennifer Leigh Heintz, The Commission, Jefferson City, for The Public Service Commission.

James M. Fischer, Larry W. Dority, Fischer & Dority PC, Jefferson City, Douglas C. Walther, Deputy General Counsel of Atmos Energy Corporation, Dallas, for Atmos Energy Corporation.

LAURA DENVIR STITH, Judge.

The Office of Public Counsel (OPC) appeals from an order entered by the Missouri Public Service Commission (PSC) rejecting the PSC staff's proposed actual cost adjustment disallowances regarding Atmos Energy Corporation's transactions with its affiliate. This Court reverses.

When a regulated gas corporation such as Atmos Energy engages in a business transaction with an affiliated entity, it is required to abide by the affiliate transaction rules set forth in the Missouri Code of State Regulations. 4 CSR 240–40.015–40.016. Due to the inherent risk of self-dealing, the presumption of prudence utilized by the PSC when reviewing regulated utility transactions should not be employed if a transaction is between a utility and the utility's affiliate.

Because the PSC reviewed the transaction between Atmos and its affiliate through the lens of the presumption of prudence, its order is unlawful and unreasonable. Accordingly, the order is reversed and the case remanded to the PSC for further review consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2007 and 2008, Atmos Energy Corporation operated as the largest natural-gas-only distributor in the United States. As a local distributing company, Atmos does not produce its own gas and does not purchase gas directly from producers. Instead, Atmos contracts with independent gas marketing companies to purchase natural gas. Atmos then delivers the purchased gas to customers through its local pipelines.

Atmos is subject to regulation as a gas corporation and public utility by the Missouri Public Service Commission (PSC). *See* § 386.020; § 386.250; *chapter 393.*[1] The PSC is a state agency established to regulate public utilities operating within the state. Pursuant to the statutory provisions in chapter 393, the PSC has jurisdiction over the rates and charges that Atmos imposes on its Missouri customers.[2]

In addition to the basic amount Atmos charges its customers under its published rate, Atmos also is permitted to charge its customers for additional costs it has incurred when the price it pays its suppliers for gas increases. These additional charges are recovered through a two-part mechanism known as a purchased gas adjustment/actual cost adjustment process (PGA/ACA). In the PGA portion of this process, a utility such as Atmos files annual tariffs in which it estimates its costs of obtaining gas over the coming year. The PGA amounts are then included in the customers' bills over the ensuing 12 months. Because it is difficult to estimate the projected changes in cost precisely, the utility then files for an adjustment, or ACA, if its actual cost is different than projected in its PGA filing. This ACA

allows the PSC to correct any discrepancies between the costs billed and the costs actually incurred. When an ACA is received, the PSC staff audits the utility's gas purchases made during the ACA period in question. As part of the review, the staff evaluates whether the rates paid by consumers for natural gas sold during the period were "just and reasonable." § 393.130.1. The PSC then takes the staff's audit into consideration and ultimately determines the proper ACA amount.[3]

Atmos submitted its 2007–2008 ACA filings to the PSC on October 16, 2008. PSC staff audited the ACA filing by reviewing and analyzing the billed revenues and actual gas costs for the period of September 1, 2007, to August 31, 2008, for each of Atmos' eight Missouri service areas. The staff's review raised concerns regarding Atmos' transactions with Atmos Energy Marketing LLC ("AEM").

AEM is a separate, unregulated but affiliated gas marketing company that is wholly owned by Atmos. Between April 2004 and November 2009, Atmos issued 48 requests for proposals (RFPs) in six other service areas. Of these 48 RFPs, AEM

---

1. All Missouri statutory references are to RSMo 2000 unless otherwise indicated.

2. In 2012, Atmos sold its Missouri assets to Liberty Utilities.

3. The PSC adopted the PGA/ACA rate mechanism pursuant to its broad power to regulate gas utilities, rather than pursuant to a specific statutory directive. *See chapter* 393; 4 CSR 240–13.010(*l*)(S) (defining "purchased gas adjustment clause"); *4 CSR 240–40.018(l)(B)* (explaining use of purchased gas adjustment clauses to control financial gains or losses associated with gas price volatility). This Court has not addressed the authority of the PSC to utilize the PGA/ACA mechanism as part of its regulation of gas utilities, although one court of appeals decision has done so. *See State ex rel. Midwest Gas Users' Ass'n v. Pub. Serv. Comm'n or State,* 976 S.W.2d 470 (Mo.

App.1998) (discussing implied authorization for use of PGA/ACA mechanism when certain procedural protections are in place). Here, as neither party challenges the use of the PGA/ACA mechanism, this Court still does not reach that issue. *Cf. State ex rel. Util. Consumers' Council of Missouri, Inc. v. Pub. Serv. Comm'n,* 585 S.W.2d 41, 46 (Mo. banc 1979) (disapproving *electric* utility's use of a fuel adjustment clause, which is similar to a PGA mechanism, because automatic adjustment clauses were unlawful under statutory scheme then in place); *State ex rel. AG Processing v. Pub. Serv. Comm'n,* 340 S.W.3d 146, 151 (Mo. App.2011) (approving *electric* utility's use of fuel adjustment clause, which permitted automatic adjustment for actual fuel costs without a full rate hearing, pursuant to legislature's 2005 enactment of section 386.266).

submitted bids in response to 24 and was the winning bidder in six.

Two of these six winning bids were for supplying gas to the Hannibal area operating system during the 2007–2008 ACA period. As required when taking bids, Atmos issued a RFP and interested suppliers submitted confidential bids proposing pricing for supplying gas services to Atmos for the Hannibal area. For the 2007–2008 ACA period at issue here, Atmos had two overlapping RFP processes; the first covered the period April 1, 2007, to March 31, 2008, and the second covered the period April 1, 2008, to March 31, 2009. For each period, Atmos sent RFP letters to 56 gas marketing companies.

During the first period, Atmos received only five bids that Atmos said conformed to the RFP requirements. Its affiliate, AEM, submitted the lowest bid at $14,723,472. The lowest conforming bid submitted by a non-affiliated gas marketer was for $15,069,726, approximately $346,000 higher than AEM's bid. During the second period, only three suppliers submitted bids that Atmos said conformed to its RFP. Its affiliate, AEM, submitted a bid of $13,947,511. This bid was approximately $100,000 lower than the next lowest bid of $14,049,424. Atmos awarded AEM both contracts.

Staff raised an issue about how the RFP set out certain supply requirements and whether AEM's bid actually conformed to the RFP requirements. It is uncontested that the RFP mandated that all gas supply be "firm and warranted." But the RFP process also allowed bidders to use either

a primary natural gas receipt point or a secondary receipt point. Primary firm delivery is the highest priority gas supply and costs more because timely delivery is assured. Secondary in-path delivery is just below primary firm delivery. The secondary delivery method, though, is still "firm" though less convenient. Both forms of delivery are preferred over "interruptible" supply, because the timing of supplying interruptible gas may be interrupted if the supplier has an inadequate quantity of gas to meet all commitments at a specific time. Staff contended it was not clear that AEM's bid was for firm rather than interruptible gas because the transaction confirmation document that normally specifies "firm" delivery was left blank. Staff also contended the distinction between primary and secondary receipt points was not made clear in the RFP bidding, which could have allowed AEM an advantage if it had insider knowledge that Atmos was willing to accept a secondary receipt point bid. Staff contends this gave AEM a benefit in the transactions because of its affiliation with Atmos.

The transactions between a utility such as Atmos and its affiliate are governed by the PSC's affiliate transaction rules. The rules establish standards for a regulated gas utility's dealings with its affiliated companies. When acquiring natural gas from an affiliate, a regulated local distribution company can compensate its affiliate only at the lesser of the gas' fair market price or the fully distributed cost to the regulated gas company were it to acquire the gas for itself. 4 CSR 240–40.016(3)(A).[4] This provision is known as

4. 4 CSR 240–40.015 is the general affiliate transaction rule, while 4 CSR 240–40.016 specifically regulates transactions between regulated gas corporations and affiliated gas marketing companies. Both 240–40.015 and 240–40.016 provide:

(A) A regulated gas corporation shall not provide a financial advantage to an affiliated entity. For the purposes of this rule, a regulated gas corporation shall be deemed to provide a financial advantage to an affiliated entity if—

the asymmetrical pricing standard. *State ex rel. Atmos Energy Corp. v. Pub. Serv. Comm'n of State*, 103 S.W.3d 753, 762 (Mo. banc 2003).

Following its audit of the 2007–2008 ACA period, the PSC staff report indicated that Atmos had failed to comply with the affiliate transaction rules because it failed to properly document the fair market value and fully distributed cost of its transactions with AEM. Staff proposed a disallowance of $308,733 for the Hannibal area, an amount equal to the profit AEM earned on that transaction.

In its filed response to the staff's recommendation, Atmos disagreed with the proposed disallowance and requested a hearing. The PSC conducted an evidentiary hearing on March 23 and 24, 2011, and issued a report and order on November 9, 2011.

In considering whether Atmos complied with the affiliate transaction rules, the PSC applied a presumption that Atmos' gas purchases were prudent and put the burden on staff to prove that the purchases from AEM were not prudent. The PSC determined that staff had failed to rebut this presumption, that the fair market price was established by Atmos' bidding process, and that this fair market price was less than the fully distributed cost for Atmos to acquire the gas itself. Based on this presumption, the PSC found compliance with the affiliate transaction rules and rejected staff's proposed disallowances regarding Atmos' transactions with AEM.

OPC filed an application for rehearing, which the PSC denied.[5] OPC appealed

and the court of appeals affirmed. This Court granted transfer pursuant to art. V, sec. 10 of the Missouri Constitution after opinion by the court of appeals.

## II.  STANDARD OF REVIEW

"Pursuant to section 386.510, the appellate standard of review of a [PSC] order is two-pronged: 'first, the reviewing court must determine whether the [PSC]'s order is lawful; and second, the court must determine whether the order is reasonable.'" *State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n of State*, 120 S.W.3d 732, 734 (Mo. banc 2003). The PSC's order has a presumption of validity, and the burden of proof is on the appellant to prove that the order is unlawful or unreasonable. *State ex rel. Sprint Missouri, Inc. v. Pub. Serv. Comm'n of State*, 165 S.W.3d 160, 164 (Mo. banc 2005). The lawfulness of an order is determined "by whether statutory authority for its issuance exists, and all legal issues are reviewed de novo." *AG Processing*, 120 S.W.3d at 734. "The decision of the [PSC] is reasonable where the order is supported by substantial, competent evidence on the whole record; the decision is not arbitrary or capricious or where the [PSC] has not abused its discretion." *State ex rel. Praxair, Inc. v. Missouri Pub. Serv. Comm'n*, 344 S.W.3d 178, 184 (Mo. banc 2011).

## III.  ANALYSIS

The OPC argues that the PSC's order is unlawful and unreasonable in that it violates 4 CSR 240–40.016 and is not based on competent and substantial evidence. The order is unlawful, the OPC contends, be-

---

1. It compensates an affiliated entity for goods or services above the lesser of—
   A. The fair market price; or
   B. The fully distributed cost to the regulated gas corporation to provide the goods or services for itself ...

5. OPC acts as consumers' advocate and represents the public in utility cases before the PSC. The powers of the OPC are set forth in section 386.710.

cause the PSC did not adhere to the asymmetrical pricing standard rules, which require documentation showing that Atmos charged customers the lesser of the fair market price or the fully distributed cost for the gas supply acquired from Atmos' affiliate, AEM. The OPC claims the order is unreasonable because it believes the PSC's conclusion that Atmos acquired gas supply from AEM at the lesser of the fully distributed cost or fair market price is not supported by competent and substantial evidence. This error was contributed to by the PSC's misreliance on the presumption of prudence in reviewing the bid of an affiliate, which OPC says is improper.

### A. Presumption of Prudence

■ The burden is on the gas corporation to prove that the gas costs it proposes to pass along to customers are just and reasonable. § 393.150.2; *see also Matter of Kansas Power and Light Co.*, 30 Mo. P.S.C. (N.S.) 76 (1989) (The gas corporation has the burden of showing its proposed rates are just and reasonable ... [and] of showing the reasonableness of costs associated with its rates for gas.)

■ While the burden of proof rests on the gas corporation, the PSC's practice has been to apply a "presumption of prudence" in determining whether a utility properly incurred its expenditures. The presumption of prudence is not a creature of statute or regulation. It first was recognized by the PSC in *Matter of Union Electric*, 27 Mo. P.S.C. (N.S.) 183 (1985) and has been applied by it since that point.

■ Under the presumption of prudence, a utility's costs "are presumed to be prudently incurred.... However, the presumption does not survive a showing of inefficiency or improvidence" that creates "serious doubt as to the prudence of an expenditure." *Id.* at 193, quoting *Anaheim, Riverside, Etc. v. Fed. Energy Reg.*

*Com'n,* 669 F.2d 799, 809 (D.C.Cir.1981). If such a showing is made, the presumption drops out and the applicant has the burden of dispelling these doubts and proving the questioned expenditure to have been prudent. *Id.*

The Missouri court of appeals has applied the presumption of prudence in cases involving affiliated companies without discussing whether its rationale is applicable to affiliates. *See, e.g., State ex rel. Pub. Counsel v. Pub. Serv. Comm'n,* 274 S.W.3d 569, 582 (Mo.App.2009) (stating without analysis that "[a]lthough UE purchased the CTGs from its affiliates, the commission properly presumed that UE was prudent in its purchase of the CTGs"); *State ex rel. Assoc. Natural Gas Co. v. Public Serv. Comm'n,* 954 S.W.2d 520 (Mo.App. 1997) (without discussing rationale court assumes presumption applies and finds Commission erred in finding it was overcome and disallowing increase where no harm to customers was shown).

This Court has not addressed directly whether the presumption of prudence is valid in either affiliate or non-affiliate cases, although it did note its existence, without addressing its legitimacy, in *dicta* in a non-affiliate case, *State ex rel. Riverside Pipeline Co., LP. v. Pub. Serv. Comm'n of State,* 215 S.W.3d 76, 85 (Mo. banc 2007). *Riverside* upheld a stipulation between the PSC and certain energy companies that precluded prudence review by the PSC.

■ The OPC agrees that a presumption of prudence is appropriately applied in arms-length transactions, and this Court concurs. When dealing at arms-length, there is a diminished probability of collusion and the pressures of a competitive market create an assumption of legitimacy.

■ OPC argues, however, that a presumption that a transaction was agreed to

prudently should not apply to *affiliate* transactions because of the greater risk of self-dealing when contracting with an affiliate. This Court again agrees. As noted in the report of a Congressional staff investigation of the particularly egregious affiliate dealings between Enron and its pipeline subsidies in the wake of Enron's collapse:

> [W]henever a company conducts transactions among its own affiliates there are inherent issues about the fairness and motivations of such transactions.... One concern is that where one affiliate in a transaction has captive customers, a one-sided deal between affiliates can saddle those customers with additional financial burdens. Another concern is that one affiliate will treat another with favoritism at the expense of other companies or in ways detrimental to the market as a whole.

Staff of Senate Comm. on Gov't Affairs, 107th Cong., *Committee Staff Investigation of the Federal Energy Regulatory Commission's Oversight of Enron* 26, n. 75 (Nov. 12, 2002); *see also* Judy Sheldrew, *Shutting the Barn Door Before the Horse Is Stolen: How and Why State Public Utility Commissions Should Regulate Transactions Between A Public Utility and Its Affiliates*, 4 NEV. L.J. 164, 195 (2003).

This greater risk inherent in affiliate transactions arises because agreements between a public utility and its affiliates are not "made at arm's length or on an open market. They are between corporations, one of which is controlled by the other. As such they are subject to suspicion and therefore present dangerous potentialities." *Pac. Tel. & Tel. Co. v. Pub. Utils. Comm'n*, 34 Cal.2d 822, 215 P.2d 441, 449 (1950) *(Carter, J., dissenting)*.

Indeed, as the PSC acknowledged in *State ex rel. Atmos Energy Corp. v. Pub.*

*Serv. Comm'n of State*, 103 S.W.3d 753, 763–64 (Mo. banc 2003), the affiliate transaction rules were adopted in response to the very kinds of concerns now raised by OPC. In that case, the concern was with a profit-producing scheme among certain public utilities termed "cross-subsidization," through which some utilities would abandon their traditional monopoly structure and expand into non-regulated areas. "This expansion [gave] utilities the opportunity and incentive to shift their non-regulated costs to their regulated operations with the effect of unnecessarily increasing the rates charged to the utilities' customers." *Id.* at 764. *See also United States v. Western Elec. Co.*, 592 F.Supp. 846, 853 (D.D.C.1984) ("As long as a [utility] is engaged in both monopoly and competitive activities, it will have the incentive as well as the ability to 'milk' the rate-of-return regulated monopoly affiliate to subsidize its competitive ventures").

Here, the concern is with an ability to offer a lower bid than one's competitors because of access to inside information about costs and terms and because of an ability to shift fixed costs to the regulated utility, thereby allowing the affiliate to bid lower due to lower overhead costs. While this Court does not suggest that there was such conduct here, the risk of this conduct and the incentive to undertake it inherently exists in affiliate transactions.

For these reasons, the rationale for permitting a presumption of prudence in arms-length transactions simply has no application to affiliate transactions. The PSC enacted the affiliate transaction rules in 2000 with the precise purpose of thwarting unnecessary rate hikes due to cross-subsidization. *State ex rel. Atmos*, 103 S.W.3d at 764. Those rules require that a utility must show that it paid the lesser of the fair market rate or the fully distributed cost to the regulated gas corporation

and require that records be kept supporting these calculations. 4 CSR 240–40.016(4)(B) ("[T]he regulated gas corporation shall document both the fair market price of such ... goods and services and the fully distributed cost to the regulated gas corporation to produce the ... goods or services for itself")

The affiliate rules' stated purpose is to "prevent regulated utilities from subsidizing their non-regulated operations ... and provide the public the assurance that their rates are not adversely impacted by the utilities' nonregulated activities." 240–40.015. A presumption that costs of transactions between affiliates were prudent is inconsistent with these rules.

For these reasons, the majority of other courts to address the issue have concluded that a presumption of prudence should not be applied to affiliate transactions. In *US W. Commc'ns, Inc. v. Pub. Serv. Comm'n of Utah*, 901 P.2d 270 (Utah 1995), the Supreme Court of Utah held that the Utah Public Service Commission correctly placed the burden on a telephone provider of proving that the services rendered by its affiliate were not duplicative. In support of its decision, the court remarked; "While the pressures of a competitive market might allow us to assume, in the absence of a showing to the contrary, that nonaffiliate expenses are reasonable, the same cannot be said of affiliate expenses not incurred in an arm's length transaction." *Id.* at 274.

The Supreme Court of Idaho reached a similar conclusion in *Boise Water Corp. v. Idaho Pub. Utilities Comm'n*, 97 Idaho 832, 555 P.2d 163 (1976). The court refused to make an exception to the rule placing upon the utility the burden of proving reasonableness of its operating expenses paid to an affiliate, stating; "The reason for this distinction between affiliate and non-affiliate expenditures appears to

be that the probability of unwarranted expenditures corresponds to the probability of collusion." *Id.* at 169. *See also, Turpen v. Oklahoma Corp. Comm'n*, 769 P.2d 1309, 1320–21 (Okla.1988) ("It is generally held that, while the regulatory agency bears the burden of proving that expenses incurred in transactions with nonaffiliates are unreasonable, the utility bears the burden of proving that expenses incurred in transactions with affiliates are reasonable"); *Michigan Gas Utilities v. Michigan Pub. Serv. Comm'n*, 206234, 1999 WL 33454925 (Mich.App. Feb. 9, 1999) ("the utility has the burden of demonstrating that its transactions with its affiliate are reasonable"). This Court concurs. A presumption of prudence is inconsistent with the rationale for the affiliate transaction rules and with the PSC's obligation to prevent regulated utilities from subsidizing their non-regulated operations.

The PSC counters that it always has recognized a presumption of prudence and that this Court cannot read the affiliate transaction rules to negate that presumption in the case of affiliated transactions because the affiliate transaction rules themselves state that they did not "modify existing legal standards regarding which party has the burden of proof in commission proceedings." 4 CSR 240–40.015(6)(C) & 240–40.016(7)(C). This argument is based on a misunderstanding of the concept of burden of proof.

Missouri law sets out the burden of proof in PSC proceedings. As noted earlier, those statutes provide that a gas corporation has the burden to prove that the gas costs it proposes to pass along to customers are just and reasonable. § 393.150.2. The PSC has no authority to adopt rules changing the burden of proof set out in the relevant statutes, and it was proper for the affiliate transaction rules to note that they did not attempt to do so. *See Kanakuk–*

*Kanakomo Kamps, Inc. v. Dir. of Revenue*, 8 S.W.3d 94, 98 (Mo. banc 1999) (A regulation that is beyond the scope of the statute is a nullity).

A change in the presumption of prudence does not change the burden of proof set out in the PSC governing statutes. The presumption of prudence does not address the burden of proof at all. It sets out *an evidentiary presumption* created by the PSC. That standard provides that the utility's expenditures are presumed to be prudent until adequate contrary evidence is produced, at which point the presumption disappears from the case. *See Deck v. Teasley*, 322 S.W.3d 536, 539 (Mo. banc 2010) (discussing general law of presumptions). This presumption affects who has the burden of proceeding, but it does not change the burden of proof, which by statute must remain on the utility.[6] § 393.150.2.

Further, the presumption of prudence is not even a creature of statute or of PSC regulations or rules. It was created by PSC case law. It cannot be applied inconsistently with the PSC's governing statutes and rules. As discussed above, the application of a presumption of prudence to a transaction with an affiliated company is inconsistent with the PSC's statutory and regulatory obligations to review affiliate transactions. Accordingly, the presumption of prudence is inapplicable to affiliate transactions.

## B. PSC Order Inappropriately Relied on Presumption of Prudence

■ The PSC used the presumption of prudence to shift the burden from Atmos, which should have been required to show that it complied with the affiliate transaction rules, and instead placed the burden on staff to show that Atmos did not do so.

The effect of the PSC's reliance on the presumption of prudence is particularly obvious in regard to the PSC's discussion of what would have been the fully distributed cost had Atmos obtained the gas itself rather than going through third parties. As noted earlier, the affiliate transaction rules mandate that a utility shall not provide a financial advantage to an affiliated entity. The utility provides a financial advantage if it "compensates an affiliated entity for . . . goods or services above the lesser of . . . [t]he fair market price . . . or [t]he fully distributed cost to the [utility] to provide the . . . goods or services for itself." 4 CSR 240–40.016(3)(A).

In all transactions that involve the purchase or receipt of goods or services from an affiliated entity, the utility must document the fair market value and the fully distributed cost, 4 CSR 240–40.016(4)(B),[7] and this documentation must be kept in books and records with "sufficient detail to permit verification with this rule." 4 CSR 240–40.016(5)(C)1.[8] The rules specifically

---

**6.** Although the above analysis is dispositive, it bears noting that the PSC has not identified any rule, regulation or decision in which it affirmatively determined prior to the adoption of the affiliate transaction rules that the presumption of prudence was applicable to affiliate transactions. For this reason also, AEM's argument is not well taken.

**7.** The regulation states in relevant part:
In transactions that involve either the purchase or receipt of information, assets, goods or services by a regulated gas corporation from an affiliated entity, the regulat-

ed gas corporation shall document both the fair market price of such information, assets, goods and services and the fully distributed cost to the regulated gas corporation to produce the information, assets, goods or services for itself.
4 CSR 240–40.016(4)(B).

**8.** The evidentiary requirement requires a regulated gas company maintain the following records:
1. Records identifying the basis used (e.g., fair market price, fully distributed cost, etc.) to record affiliate transactions; and

define what figures must be included in the calculation of the fully distributed cost:

Fully distributed cost (FDC) means a methodology that examines all costs of an enterprise in relation to all the goods and services that are produced. FDC requires recognition of all costs incurred directly or indirectly used to produce a good or service. Costs are assigned either through a direct or allocated approach. Costs that cannot be directly assigned or indirectly allocated (e.g., general or administrative) must also be included in the FDC calculation through a general allocation.

4 CSR 240–40.016(1)(F).

Due to its reliance on the presumption of prudence, the PSC did not consider whether Atmos kept the required books and records and whether Atmos showed that its fully distributed costs were higher than the fair market value of the services received from its' affiliate. Neither did it require Atmos or AEM to produce most of these records to staff or OPC.[9] Staff did not have evidence as to how AEM prepared its bid or as to the sharing of costs between Atmos and AEM because it had not been able to obtain this information. This led the PSC to reject staff's proposed disallowance of $308,733 in profits because, it found, staff did not offer "any serious argument to suggest that Atmos could provide gas-marketing services for itself cheaper if it did not use the services of gas marketing companies."

Of course, it was not up to staff to prove a negative. Whether staff thought the cost would have been cheaper if Atmos had not used the affiliate was the not the relevant question; the affiliate transaction rules put the burden on Atmos to keep records that would allow it to show it would not have been cheaper.

The PSC notes that staff did not specifically contest what Atmos' costs of providing its own gas marketing services would have been. OPC, however, did contest this issue. In its initial brief before the PSC, OPC specifically challenged the prudence of purchasing gas at a marked-up price from an affiliate rather than by Atmos acquiring the gas itself at a similar or lesser cost, stating, "Atmos' decision to purchase gas through its marketing affiliate AEM, rather than by making the gas purchases itself (and avoiding the AEM profit mark-up) is reason alone to render Atmos' purchasing decisions imprudent."

OPC argues that the PSC erred in simply presuming that, because there was a bid process, the lowest price bid must have been the lowest fair market value of the gas. It argues that the number of bidders was so low that the bid process was inadequate to identify the fair market value of the gas. OPC also specifically questions whether Atmos required AEM to bid for the same service as the other companies to whom Atmos sent an RFP in light of staff's evidence that the agreement between Atmos and AEM left blank whether

2. Books of accounts and supporting records in sufficient detail to permit verification of compliance with this rule.
4 CSR 240–40.016(5)(C).

**9.** This also led the PSC to not resolve the issue whether Atmos adequately complied with the PSC's order compelling production of certain information in its books and records and whether the order went beyond what was required by the affiliate transaction rules. In light of the presumption of pru-

dence, the PSC found that this discovery was not necessary. Because it is appropriate for the PSC to determine the parties' disagreement on the meaning, effect and compliance with the motion to compel in the first instance in light of this Court's ruling on the inappropriateness of using the presumption of prudence in affiliate transactions, this Court does not resolve this issue here but leaves it for the PSC to resolve on remand.

the gas was to be "firm" or "interruptible gas," whereas other gas-supply agreements between Atmos and non-affiliates specifically identified that firm gas was required. This was an important distinction because, as noted earlier, firm gas transportation, for which delivery is guaranteed, is generally more expensive than interruptible transportation, for which delivery can be delayed if the pipeline's capacity is completely in use.

OPC suggests that if Atmos requested proposals for firm gas transportation with the understanding that it would be sufficient if AEM bid the cost of interruptible gas transportation, it would have allowed AEM to undercut the other gas marketers' bids. If this were what happened, the bid by AEM most certainly would not have reflected the "fair market price" of firm gas.

Similarly, OPC questioned whether the bidding process adequately established the fair market price due to the low number of conforming bids submitted by non-affiliated gas marketers. In the first RFP, only four non-affiliated gas marketers submitted conforming bids; in the second RFP, only two did so (and only if one presumes that they all bid on firm rather than interruptible gas). The record does not show whether the PSC would have considered this a sufficient response to enable it to determine the fair market value of the gas had it not relied on the presumption of prudence.

As with the question of fully distributed costs, due to its reliance on the presumption of prudence, the PSC did not develop a sufficient record on these or related issues to permit this Court to determine whether Atmos complied with the affiliate transaction rules and whether the PSC order is reasonable and lawful. This Court remands so that the PSC can re-solve these issues in the first instance based on the proper standard.

## IV. CONCLUSION

The PSC erred in relying upon the presumption of prudence in rejecting staff and OPC's proposed disallowance for Atmos' Hannibal service area gas costs. The affiliate transaction rules were enacted in an effort to prevent regulated utilities from subsidizing their non-regulated activities. To presume that a regulated utility's costs in a transaction with an affiliate were incurred prudently is inconsistent with these rules.

The PSC relied heavily on the presumption of prudence in rejecting staff's proposed disallowance. This error resulted in an order that is unlawful and unreasonable. On remand, the PSC again must consider whether Atmos compensated AEM above the lesser of the fair market price or the fully distributed cost to Atmos to provide the gas for itself. To satisfy the affiliate transaction rules' requirements, Atmos must provide sufficient asymmetrical pricing documentation as to fair market value, including the bidding process, and the calculation of the fully distributed cost. The PSC's order is reversed, and the case remanded.

All concur.