

# SUPREME COURT OF MISSOURI
## en banc

SPIRE MISSOURI, INC., F/K/A )    *Opinion issued February 9, 2021*
LACLEDE GAS COMPANY, )
   )
               Appellant, )
   )
v. )
   )
PUBLIC SERVICE COMMISSION OF )    No. SC97834
THE STATE OF MISSOURI, )
   )
               Respondent, )
   )
and )
   )
OFFICE OF PUBLIC COUNSEL, )
   )
               Intervenor. )

**APPEAL FROM THE MISSOURI PUBLIC SERVICE COMMISSION**

Spire Missouri, Inc. ("Spire), formerly known as Laclede Gas Co., is an investor-owned public utility regulated by the Public Service Commission ("PSC"). In April 2017, Spire filed tariffs to increase its general rates for gas services in its Spire Missouri East and Spire Missouri West territories.[1] The PSC suspended Spire's new

---

[1] Spire East was formerly known as Laclede Gas Company, and Spire West was formerly known as Missouri Gas Energy. For ease of use, only currently existing business entities and

tariffs until March 2018 and established a test year. The cases were consolidated, and several parties were granted intervention. The PSC issued its Amended Report and Order in March 2018. Among the PSC's conclusions, the Amended Report and Order disallowed a portion of Spire's rate case expenses, included some of the proceeds from the 2014 sale of a facility in setting Spire's new rates, and determined Spire East's prepaid pension asset was $131.4 million (or approximately $28.8 million less than Spire contended). Spire appeals. This Court has jurisdiction pursuant to article V, section 10 of the Missouri Constitution. The Amended Report and Order is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

**Background**

In April 2017, Spire filed tariffs with the PSC that would implement general rate increases in its Spire East and Spire West service areas. The tariffs would have increased annual gas revenue for Spire East by approximately $58.1 million. Because approximately $29.5 million of this already was being recovered through Spire's infrastructure system replacement surcharge ("ISRS"), the net increase in revenue for Spire East would be $28.5 million. The tariffs would have increased annual gas revenue for Spire West by approximately $50.4 million. Because approximately $13.4 million of this already was being recovered through Spire West's ISRS, the net increase in revenue for Spire West would be $37 million.

corresponding service areas are referenced herein, even though those entities had not yet been formed during a part of the time period at issue in this case.

2

The PSC suspended Spire's general rate increase tariffs until March 2018 and established a test year for the 12-month period ending December 31, 2016, to be updated for known and measurable changes through June 30, 2017. Several parties, including the Office of Public Counsel, were granted intervention,[2] and the cases were consolidated for hearing purposes. The PSC held local public hearings. The PSC then held evidentiary hearings and true-up hearings followed by briefing. Several issues were resolved by stipulations unopposed by any of the non-signatory parties, and the PSC approved those stipulations. The PSC then issued its consolidated Amended Report and Order on March 7, 2018, which became effective March 17, 2018.

Among the many issues before it, the PSC considered what portion of Spire's rate case expenses ought to be included in Spire's new base rates (and, therefore, paid for by Spire's customers rather than its investors). The PSC concluded that, because it is required under section 393.130.1[3] to set rates that are "just and reasonable," it had the broad discretion to determine whether it was just and reasonable for Spire's shareholders to share the burden of rate case expenses with ratepayers. As of September 30, 2017, Spire's total rate case expenses were $1,393,399. The PSC's staff of technical and subject matter experts ("Staff") recommended disallowing expenses relating to the

---

[2] These parties also included: Missouri Industrial Energy Consumers; Midwest Energy Consumers Group; Missouri Department of Economic Development – Division of Energy; Missouri School Board Association; the City of St. Joseph; National Housing Trust; Environmental Defense Fund; MoGas Pipeline, LLC; USW Local 11-6, which intervened only in the Spire East case; and Kansas City Power & Light Company and KCP&L Greater Missouri Operations, which intervened only in the Spire West case.

[3] All statutory references are to RSMo 2016.

procurement of a Cash Working Capital study by the consultant firm ScottMadden. The Office of Public Counsel recommended disallowing expenses related to Spire's expert witness Thomas Flaherty because of the high hourly rate charged. The PSC determined that approximately half the litigated issues in this case were driven by Spire and among these issues were the proposed use of various shareholder-favorable ratemaking tools, including a revenue stabilization mechanism, a rate of return on equity of 10.35 percent (which would have been the highest of any large utility in Missouri), tracking mechanisms to limit shareholder risk, and earnings-based incentive compensation. The PSC further determined Spire "padded" its revenue requirement by pursing positions it did not expect to win. Accordingly, the PSC determined Spire should recover the entire cost of customer notices, totaling $436,000, and Spire's depreciation study,[4] totaling $54,114, but only 50 percent of Spire's remaining rate case expenses. The PSC ordered these allowed rate case expenses normalized over four years.

The PSC also considered whether some of the proceeds of Spire's sale of one of its service centers should be used to offset Spire's purchase of a more expensive service center and, therefore, inure to the benefit of ratepayers. Spire East owned and operated three district service centers providing leak detection, leak repair, construction, maintenance, and marking services. One of the service centers was located near Forest Park in the city of St. Louis ("the Forest Park property"). In 2013, Spire acquired two properties adjacent to the Forest Park property for additional leverage in negotiations.

---

[4] Gas utilities are required to file a depreciation study every five years pursuant to 20 C.S.R. § 4240-3.160(1)(A).

Then, in 2014, as part of a restructuring of Spire following the acquisition of Spire West, Spire sold the Forest Park property (and the two adjacent properties) to the Cortex Innovation Community in St. Louis, which purchased the properties for construction of an IKEA retail store. The sale price for the Forest Park property included a gain of approximately $7.6 million, excluding the $1.8 million undepreciated book value of recent capital improvements to the facilities, and an allowance of $5.7 million for relocation expenses. Of the relocation expense allowance, Spire used $1.95 million to purchase furniture and fixtures for its new offices at 700 and 800 Market Street in the city of St. Louis and $200,000 to lease a temporary space during the move. The evidence did not show how much (if any) of the remaining relocation expenses were necessitated by the move from the Forest Park property to the new Manchester center. Spire contributed $1.5 million from the gain as a civic contribution to further downtown St. Louis rehabilitation.

In November 2016, Spire opened the newly constructed Manchester Avenue facility in the city of St. Louis as a partial replacement for the Forest Park property. The Manchester Avenue facility has a greater capital cost ($7.7 million base rate value), but it is more efficient to operate than the aging Forest Park facility. Pursuant to section 393.190, gas utilities must obtain authorization from the PSC to sell any part of its system that is necessary or useful in the performance of its duties to the public, but Spire did not obtain this authorization prior to selling its Forest Park property.

The PSC was required to decide whether to consider all, some, or none of the proceeds from the sale of the Forest Park property in setting Spire's new rates. Per Staff's recommendation, the PSC ordered nearly $3.6 million from the sale (the $5.7 million relocation costs, less documented relocation expenses and the cost of furniture and fixtures for the new offices) be used to offset the cost of the more expensive capital asset of the Manchester Avenue facility. The PSC ordered this amount amortized over five years.

Finally, the PSC considered the amount of Spire's pension contributions to include in base rates. Spire makes contributions to its pension plan pursuant to a collective bargaining agreement with its union employees. A prepaid pension asset is a regulatory asset representing the amount Spire has contributed to its pension plan but has not yet recovered from ratepayers. A pension liability is the opposite; it arises when Spire collects more from ratepayers than it has contributed to its pension plan. It is undisputed that Spire West has a pension liability of $28.4 million, but the amount of Spire East's pension asset (or liability) was in dispute. Staff and Spire agree that at least $131.4 million has accumulated in Spire East's pension asset since 1996, but they disagree as to what amount (if any) accumulated prior to that time. Spire argued the pension asset includes an additional $28.8 million, which accumulated between 1990 and 1996, during which time Spire East filed rate cases in 1990 (i.e., rates for 1990-1992), 1992 (i.e., rates for 1992-1994), and 1994 (i.e., rates for 1994-1996).

The disagreement between Staff and Spire centers on whether Spire East used the cash or accrual method of accounting to account for the pension asset in its 1990, 1992,

6

and 1994 rate cases. FAS 87 and FAS 88 are Financial Accounting Standards articulating generally accepted accounting principles in accounting for the accrual of a pension asset. These are used routinely in reporting but less regularly in ratemaking. Staff argued Spire East did not begin to use both FAS 87 and FAS 88 to calculate its pension asset in rate cases until the 1996 rate case in that it used neither standard in the 1990 and 1992 cases and only FAS 87 (but not FAS 88) in the 1994 rate case. Spire concedes there is evidence suggesting its pension expense was calculated on a cash basis in the 1992 rate case but argues it had been using FAS 87 for financial reporting purposes since 1987 and, therefore, FAS 87 and FAS 88 would had to have been (and were) used in the 1990, 1992, and 1994 rate cases. With respect to the 1994 rate case, Spire contends the explicit references to FAS 87 necessarily included reference to FAS 88 because the two are inseparably intertwined and the former would not have been used without the latter. The amount in dispute from 1990 through 1994 is $19.8 million, and the amount in dispute between 1994 and 1996 is $9 million.

In its Amended Report and Order, the PSC rejected Spire's position and adopted, instead, the testimony of Staff witness Young. Among his lengthy and complex testimony, Young testified that – even though Spire has used FAS 87 for reporting since 1987 – neither Spire East's nor Staff's accounting schedules in the 1990, 1992, and 1994 rate cases itemized a pension asset using FAS 87 and FAS 88. This was supported by the record in the 1992 rate case, which seems clearly to rely upon the cash accounting approach. Staff contends only FAS 87, but not FAS 88, was used in the 1994 rate case. Because the PSC determined Spire East used the cash method in all three rate cases, it

7

disallowed $19.8 million in claimed pension assets for 1990 through 1994 and $9 million in claimed pension assets for 1994 to 1996. As a result, the PSC determined Spire East's pension asset was $131.4 million, to be amortized over eight years.

**Discussion**

## I. *General principles governing the PSC and judicial review*

Before proceeding to the merits of this case and analyzing Spire's points on appeal, three principles fundamental to the law governing public utility regulation warrant emphasis.

A PSC decision is presumed valid and the burden is on the party challenging it to demonstrate the decision is unlawful or unreasonable. *Mo. Pub. Serv. Comm'n v. Union Elec. Co.*, 552 S.W.3d 532, 538-39 (Mo. banc 2018). *See also* § 386.510 (providing for judicial review of "the reasonableness or lawfulness of the original order" from the PSC). The decision is lawful where the PSC has statutory authority to render its decision. *Union Elec. Co.*, 552 S.W.3d at 539. It is reasonable if supported by substantial, competent evidence on the whole record, it is not arbitrary and capricious, and is not based on an abuse of discretion. *Id. See also* § 536.140.2 (providing for judicial review of agency decisions to determine whether the action of the agency: "(1) Is in violation of constitutional provisions; (2) Is in excess of the statutory authority or jurisdiction of the agency; (3) Is unsupported by competent and substantial evidence upon the whole record; (4) Is, for any other reason, unauthorized by law; (5) Is made upon unlawful procedure or without a fair trial; (6) Is arbitrary, capricious or unreasonable; (7) Involves an abuse of discretion").

8

This two-step analysis of lawfulness and reasonableness is required by, and instituted in furtherance of, article V, section 18 of the Missouri Constitution, which provides that judicial review of administrative decisions "shall include the determination whether the same are authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record." Analyzing the constitutional standard that administrative decisions must be supported by competent and substantial evidence on the whole record, this Court explained that judicial review of administrative factfinding ***does not*** view the evidence and all reasonable inferences in the light most favorable to the award or decision. *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003). Instead:

> A court must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence. Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record. An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence.

*Id*. at 222-23 (citations and footnotes omitted). This approach gives weight to the administrative agency's role as the finder of fact without abdicating the requirement in article V, section 18 that the judiciary stand as an independent check against abuse by the executive branch when it undertakes a judicial or quasi-judicial function.

Second, a public utility is entitled to recover from ratepayers all its costs (plus a reasonable return on its investments) by way of rates that are "just and reasonable." *Office of Pub. Counsel v. Mo. Pub. Serv. Comm'n*, 409 S.W.3d 371, 376 (Mo. banc 2013). *Accord Mo. Pub. Serv. Comm'n*, 552 S.W.3d at 534 ("As a general matter,

9

utilities ... recover their costs (plus a reasonable return on their investments) through the sale of [gas] at the rates set by the [PSC].”); § 393.150.2 (“At any hearing involving a rate sought to be increased, the burden of proof to show that the increased rate or proposed increased rate is ***just and reasonable*** shall be upon the gas corporation ....”) (emphasis added).  “Just and reasonable” rates, therefore, allow public utilities to recover expenses that are (1) fair to both investors and ratepayers and (2) prudently incurred.  The PSC ordinarily applies a presumption of prudence in determining whether a utility reasonably incurred its expenses.  *Office of Pub. Counsel*, 409 S.W.3d at 376.  This presumption of prudence will “not survive a showing of inefficiency or improvidence that creates serious doubt as to the prudence of an expenditure.”  *Id.* (quotation omitted).  “If such a showing is made, the presumption drops out and the applicant has the burden of dispelling these doubts and proving the questioned expenditure to have been prudent.”  *Id.*

Finally, the PSC is prohibited from engaging in retroactive ratemaking.  This is one of the bedrock principles long governing the PSC’s role in setting rates.  As this Court has explained:

> The [PSC] has the authority to determine the rate [t]o be charged.  In so determining it may consider past excess recovery insofar as this is relevant to its determination of what rate is necessary to provide a just and reasonable return in the future, and so avoid further excess recovery.  It may not, however, redetermine rates already established and paid without depriving the utility (or the consumer if the rates were originally too low) of his property without due process .... The utilities take the risk that rates filed by them will be inadequate, or excessive, each time they seek rate approval.  To permit them to collect additional amounts simply because they had additional past expenses not covered by either clause is retroactive rate making, i. e., the setting of rates which permit a utility to recover past

losses or which require it to refund past excess profits collected under a rate that did not perfectly match expenses plus rate-of-return with the rate actually established. Past expenses are used as a basis for determining what rate is reasonable to be charged in the future in order to avoid further excess profits or future losses, but under the prospective language of the statutes, they cannot be used to set future rates to recover for past losses due to imperfect matching of rates with expenses.

*State ex rel. Utility Consumers' Council of Mo., Inc. v. Pub. Serv. Comm'n*, 585 S.W.2d 41, 58-59 (Mo. banc 1979) ("*UCCM*") (citations omitted), *superseded on other grounds by* § 386.266. In other words, the PSC must determine a rate that is just and reasonable using a utility's past expenses *only* as a way to estimate the utility's future costs (and fair return); not to allow a utility to recover past losses or to force it to refund ratepayers past excess profits.

## II. Rate Case Expenses

Spire, in its first point, argues the PSC's decision to exclude a portion[5] of Spire's rate case expenses is contrary to law because the PSC did not find that any of those expenses were imprudent. In its second point, Spire argues this exclusion was unreasonable, arbitrary and capricious, unsupported by competent and substantial evidence, or an abuse of discretion. Both points are denied.

The PSC did not err by excluding a portion of Spire's rate case expenses when calculating Spire's new rates. The expenses Spire sought to recover included: (a) the procurement of a Cash Working Capital study by the consultant firm ScottMadden;

---

[5] Spire's metronomic insistence that the PSC denied "half" or "almost half" of its rate case expenses is both inaccurate and unavailing. Spire's total rate case expenses were nearly $1.4 million as of September 2017. The PSC allowed full recovery of the cost of customer notices ($436,000) and the depreciation study ($54,000). Accordingly, even after the PSC disallowed

11

(b) unreasonably high hourly fees paid to Spire's expert witness Thomas J. Flaherty; and

(c) various shareholder-oriented (and unlikely to succeed) ratemaking strategies such as a revenue stabilization mechanism, a 10.35-percent rate of return on equity (the highest of any large utility in Missouri), tracking mechanisms to limit shareholder risk, and earnings-based incentive compensation. In terms of their reasonableness, these expenditures were entitled to a presumption of prudence, and the ***prudence*** of the expenditures was never called into question. Nonetheless, the PSC concluded that including all of these expenditures in setting Spire's future rates was not ***just*** because some of the expenses were not fair to ratepayers in that they only were incurred to benefit (if anyone) Spire's shareholders. *See Office of Pub. Counsel*, 409 S.W.3d at 376. Implicit in Spire's argument is an assertion that it is entitled to recover all prudent expenditures in its rates. This is not so. In setting rates, the PSC has broad discretion to include or exclude expenditures to arrive at rates it deems to be "just and reasonable," subject, of course, to judicial review that the PSC's conclusions are supported by competent and substantial evidence and not arbitrary, capricious, or an abuse of discretion.

Generally, ratepayers benefit from rate cases because they have an interest in ensuring the financial well-being of the utilities that serve them. Therefore, ratepayers justly and reasonably can be expected to pay a utility's expenses in bringing such a case. But this does not mean there cannot be limits. A utility cannot spend any amount it

_____

approximately $452,000 of the remaining expenses, Spire recovered approximately $942,000 (or 68 percent) of its total rate case expenses.

12

pleases secure in the knowledge or expectation that ratepayers will foot the bill, particularly when those expenses include items seeking to subordinate ratepayers' interests to those of the utility's investors. Here, even assuming there was no basis in the evidence to reject the presumption of prudence with respect to one or more of Spire's rate case expenses, the PSC did not err in its decision to exclude a portion of those expenses in setting "just and reasonable" rates because they served only to benefit shareholders and minimize shareholder risk with no accompanying benefit (or potential benefit) to ratepayers. To be sure, the PSC's decision to exclude 50 percent of Spire's remaining rate case expenses (after allowing full recovery of the cost of notices and the depreciation study) was not the result of a decision to include or exclude expenses on an item-by-item basis. This is not to say, however, that the PSC's decision was unsupported by competent and substantial evidence on the whole record, and it was far from the sort of irrational or unconsidered approached properly characterized as arbitrary, capricious, or an abuse of discretion. *Cf. Cox v. Kan. City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 114 (Mo. banc 2015) ("A ruling constitutes an abuse of discretion when it is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.").

The PSC expressly identified those issues (and related expenses) Spire pursued that benefitted only its shareholders and not its ratepayers, and the PSC decided what proportion of the total case (and expenses) they represented.[6] Nothing in the PSC's

---

[6] Spire also argues the PSC's determination to disallow a portion of its rate case expenses is inconsistent with Spire's low average expenses in other cases and contends the PSC's

13

authorizing statutes or this Court's precedents requires the PSC to conduct an item-by-item analysis when the issue is the degree to which a utility's case expenses should be included in calculating "just and reasonable" rates rather rejecting a particular expense as imprudent. Accordingly, the PSC did not err in excluding a portion of Spire's rate case expenses, and Spire's Points I and II are denied.

### III. Forest Park Property Sale

Spire next argues the PSC erred by ordering that nearly $3.6 million in relocation proceeds from the sale of the Forest Park property be used to reduce rates. In its second point, Spire claims this constitutes prohibited retroactive ratemaking and, alternatively, that it was arbitrary and capricious in that it was contrary to the traditional treatment of gains on the sale of utility property.[7] This point is denied.

The PSC did not engage in prohibited retroactive ratemaking. Retroactive ratemaking is setting rates for the future in order to redress imprecision in setting prior rates, i.e., to allow the utility to recover prior losses or force it to disgorge excessive profits. *UCCM*, 585 S.W.2d at 58. This does not mean, however, that the prohibition

---

disallowance amounts to a penalty for Spire exercising its right to prosecute a rate case as it sees fit. The first argument is unconvincing and largely irrelevant because Spire's expenses in other cases are not the issue in and formed no part of the PSC's decision now before the Court. Spire's claim that it is being penalized fares no better because nothing in the PSC's decision restricts what Spire can and cannot raise in a rate case. Instead, it merely addresses who (between the shareholder and the ratepayers) should be burdened with the cost of the decisions Spire makes in this regard.

[7] This point is multifarious in that it asserts the PSC's decision regarding relocation expenses was error for two separate and distinct reasons. *Bowers v. Bowers*, 543 S.W.3d 608, 615 n.9 (Mo. banc 2018). Multifarious points preserve nothing for appellate review because they fail to comply with Rule 84.04(d). *Id.* This Court, however, has discretion to review, *ex gratia*, multifarious points on the merits and elects to exercise that discretion here. *Id.*

14

against retroactive ratemaking bars all reference to events occurring outside the test year. *See State ex rel. GTE N., Inc. v. Mo. Pub. Serv. Comm'n*, 835 S.W.2d 356, 368 (Mo. App. 1992) (approving such reference when the "adjustment is (1) 'known and measurable,' (2) promotes the proper relationship of investment, revenues and expenses, and (3) is representative of the conditions anticipated during the time the rates will be in effect"). It is important that the trees do not obscure the forest. The use of the test year concept, the adjustments made to that year, and reference to events outside that year, are merely tools for the PSC to wield in pursuit of identifying rates that are "just and reasonable" as required by § 393.130.1.

For Spire East's future rates to be "just and reasonable," the PSC determined those rates needed to reflect the impact of the sale of the Forest Park property even though that sale occurred outside the test year. Specifically, the PSC determined (among other related matters) that: a) section 393.190.1 required Spire to obtain prior approval of this sale from the PSC but it failed to do so; b) the new service center was a more expensive capital asset than the Forest Park property; and c) the evidence did not establish how much (if any) of the nearly $3.6 million in unspecified relocation expenses were incurred in the move from the Forest Park property to the Manchester property. Spire's point relied on does not claim these findings (or others underlying the PSC's treatment of the Forest Park property sale) were not supported by competent and substantial evidence on the record as a whole, only that this treatment was retroactive ratemaking and inconsistent with the PSC's prior practice. Because there is no

15

suggestion the PSC was setting Spire's new rates to account for profits or losses resulting from prior rates, Spire's claim that this was prohibited, retroactive ratemaking is denied.

The Court also rejects Spire's contention that the PSC's decision regarding the sale of the Forest Park property was arbitrary and capricious because it departed from approaches taken by the PSC in prior cases. "[A]n administrative agency is not bound by *stare decisis,* nor are PSC decisions binding precedent on this Court." *State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n of Mo.*, 120 S.W.3d 732, 736 (Mo. banc 2003). Therefore, even if the Court assumes (without deciding) that the PSC's approach was a departure from its prior practice, this alone does not render the PSC's approach so illogical or unreasonable as to justify a conclusion that it was arbitrary, capricious, or an abuse of discretion. *Cf. Cox*, 473 S.W.3d at 114 (An abuse of discretion occurs when decision is "clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration."). Because the PSC's decision shows a reasoned, careful approach to what may well be a new or newly increasing problem, this Court rejects Spire's claim that it was arbitrary, capricious, or an abuse of discretion merely because it may have departed from prior decisions on similar issues.

## IV. *Spire East's Pension Asset*

In its final point, Spire argues the PSC's decision to eliminate $28.8 million from Spire East's pension asset was arbitrary, capricious, or unsupported by competent and substantial evidence because it was inconsistent with Spire's evidence that the pension

16

asset was calculated using FAS 87 and FAS 88 throughout Spire's 1990, 1992, and 1994 rate cases. This claim is rejected in part and granted in part.

Spire concedes the pension asset was determined on a cash basis in the 1992 rate case. Nevertheless, Spire points to testimony in the 1990 rate case by Staff witness Rackers that Spire contends supports the conclusion that the pension asset in that case was calculated pursuant to FAS 87 and FAS 88 accounting standards. And, because no departure from this approach was explicitly authorized in the 1992 rate case, Spire argues this could support a finding in its favor regarding that case as well. But this argument was in stark contrast to the testimony of Staff witness Young, who testified that neither Spire East nor Staff included an itemized pension asset based on FAS 87 and FAS 88 in their accounting schedules for Spire's rate cases between 1987 and 1994. Accordingly, there was competent and substantial evidence for the PSC to decide either way with respect to how the pension asset was calculated in the 1990 and 1992 cases. This Court will not substitute its judgment for that of the PSC as to how such a complex question should be resolved where the evidence was in such near equipoise. *See Hampton*, 121 S.W.3d at 222-23.

But the evidentiary scales were not so nearly balanced with respect to how Spire's pension liability was accounted for in the 1994 rate case. Spire showed (and Staff clearly recognized) that Spire East began to use FAS 87 beginning with the 1994 rate case. But, because Staff argues that there was no similar showing with respect to Spire East's use of FAS 88, Staff claimed the cash accounting must have been used to calculate the pension asset in the 1994 rate case and the $9 million accruing between 1994 and 1996 should be

excluded.  But Spire's evidence (which was uncontroverted) showed that FAS 87 and

FAS 88 are inextricably linked, that the former would not have been used without the

latter, and that reference to FAS 87 was simply shorthand for reference to both FAS 87

and FAS 88.  Moreover, the record in the 1994 rate case suggests the dispute was not

over whether FAS 88 would be used but rather how it would be used.  In light of this, the

Court holds the PSC's decision to extend the period in which it determined Spire East

used cash accounting to value its pension asset from 1994 to 1996 was not supported by

competent and substantial evidence on the record as a whole.  Viewed in isolation, there

was evidence to support the PSC's decision in this respect, but this Court's review does

not use this approach.  *Id.*[8]  Instead, the PSC's decision must be supported by competent

and substantial evidence on the whole record, including the evidence the PSC rejected.

In this very close case, the Court is persuaded it was not.   Accordingly, though the Court

affirms the PSC's Amended Report and Order in all other respects, the Amended Report

and Order is reversed to this extent and the matter remanded to the PSC to add the

$9 million in pension assets that accrued between 1994 and 1996 to Spire East's

$131.4 million prepaid pension asset.  Because this increase in the amount of Spire East's

---

[8]   After *Hampton*, this Court revisited the issue to emphasize that judicial review of an administrative agency finding is not at all like appellate review of a circuit court finding.  *Seck v. Dep't of Transp.*, 434 S.W.3d 74, 78-79 (Mo. banc 2014).  In reviewing a circuit court's finding, an appellate court considers only the evidence and reasonable inferences that support that finding and examines that evidence and those inferences only in the light most favorable to the finding the circuit court made.  *Id.* at 78-79.  In reviewing a factual finding made by an administrative agency, on the other hand, judicial review is governed by article V, section 18 of the Missouri Constitution and "must consider all of the evidence that was before the agency and all of the reasonable inferences … including the evidence and inferences that the agency rejected in making its findings."  *Id.* at 79.

pension asset might bear on its amortization, the case is remanded for further proceedings consistent with this opinion.

## CONCLUSION

For the reasons set forth above, the PSC's Amended Report and Order is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

_____
Paul C. Wilson, Judge

All concur.